BARRON BANCSHARES, INC.,
et al., Plaintiffs,

and

Federal Deposit Insurance Corporation,
Plaintiff–Intervenor,

v.

The UNITED STATES, Defendant.

No. 90–830 C.

United States Court of Federal Claims.

Aug. 23, 2002.

Susan E. Barnes, Lindquist & Vennum, P.L.L.P., Minneapolis, MN, attorney of record for plaintiffs Barron Bancshares, Inc., William J. Oestreicher, Michael V. Masterson, Scott J. Teigen, Henry C. Martinsen and Donald P. Zeitlow, Mark Briol and Scott A. Benson, Briol & Associates, Minneapolis, MN, of counsel.

Mary Ann McNamar, Federal Deposit Insurance Corporation, Washington, DC, attorney of record for plaintiff-intervenor, Herbert J. Messite, Federal Deposit Insurance Corporation, Washington, DC, of counsel.

Tarek Sawi, with whom were Acting Assistant General Attorney General David W. Ogden, Director David M. Cohen, and Deputy Director Jeanne E. Davidson, Civil Division, Department of Justice, Washington, DC, for defendant, Elizabeth W. Newsom, on briefs.

## OPINION

WIESE, Judge.

This case is one of the many suits pending in this court known collectively as the *Winstar* litigation. *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Plaintiffs are five individual investors who acquired control of a failing thrift through a holding company; the holding company itself; and the Federal Deposit Insurance Corporation, acting as receiver for the subsequently seized thrift. Currently before the court are Plaintiff Federal Deposit Insurance Corporation's Motion for Partial Summary Judgment on Liability, dated February 19, 1999; Defendant's Motion to Dismiss Portions of the Complaints and Motion for Partial Summary Judgment, dated September 16, 1999; and Investors' Renewed Motion for Summary Judgment as to Liability, dated November 9, 1999.

The court heard oral argument on these motions on July 11, 2002. For the reasons set forth below, defendant's motions to dismiss and for partial summary judgment are granted and the FDIC's and investor plaintiffs' motions are each denied.

## FACTS

This case arises out of the savings and loan crisis of the late 1980s, a complete discussion of which can be found in *Winstar*, 518 U.S. at 844–48, 116 S.Ct. 2432. Briefly stated, during the early and mid–1980s, rising interest rates forced savings and loan institutions to pay more in interest for their short-term liabilities, *i.e.*, deposits, than they were earning on their fixed, long-term assets, *i.e.*, mortgages. The resulting imbalance, particularly when combined with high levels of non-performing loans, caused a number of institutions to fail. Barron County Federal Savings and Loan Association ("Barron County" and later "Monycor")[1] found itself in that position by mid-decade.

Barron County declared insolvency on May 31, 1985, and by August 31, 1986, was reporting a negative net worth of $5.734 million. In response to the thrift's precarious financial position, the Federal Home Loan Bank Board of Chicago ("FHLBB") determined that Barron County should be recapitalized

---

1. After being converted to a stock corporation, Barron County Federal Savings and Loan Association ("Barron County") was renamed Barron Federal Savings Bank ("Barron Federal"), and then later renamed Monycor Savings Bank. For the sake of clarity, we refer to the thrift prior to its 1986 acquisition as "Barron County" and in its post-acquisition status as "Monycor."

by converting the thrift from a mutual association to a stock association and then selling the capital stock.

Pursuant to that course of action, the FHLBB solicited and received two bids for the thrift's conversion. The first bid, submitted by First Federal Savings and Loan Association of Lacrosse, was projected to cost the government $17,880,000, a savings of less than $1 million over the $18,651,000 estimated cost of liquidating the thrift. In contrast, a group of investors led by William J. Oestreicher (referred to here as "investor plaintiffs") submitted a bid that was anticipated to cost the government approximately $11,686,000. Investor plaintiffs were thus chosen by the FHLBB to acquire Barron County.[2]

In order to effect the transaction, investor plaintiffs, with the approval of the FHLBB, formed a holding company, Barron Bancshares, Inc. ("the holding company"), for the sole purpose of acquiring Barron County. The holding company in turn was authorized to issue $4,250,000 in capital stock to investor plaintiffs, the proceeds of which were to be used by the holding company to purchase 100 percent of the thrift's stock. Investor plaintiffs additionally contributed another $500,000 to fund the acquisition.

The resulting transaction was memorialized in three sets of documents: FHLBB Resolution Nos. 86–1215, 86–1215A and 86–1215B (all dated December 10, 1986); an FHLBB forbearance letter dated December 17, 1986; and an assistance agreement dated December 15, 1986. The first set of documents, the three FHLBB resolutions, authorized the thrift's conversion to a stock association and set forth various accounting principles applicable to the recapitalized thrift. Under Resolution No. 86–1215, the thrift was directed to use the "push-down" accounting method in recording the value of the acquisition on its books. Pursuant to this method, assets were to be "marked to market," i.e., valued as of the date of the transaction. The application of this accounting method resulted in an excess of liabilities over assets, thus creating $5,907,708 in intangible assets, including $4,908,000 in unallocated good will. The resolution further provided that any intangible assets created by the acquisition were to be amortized by the straight-line method over a period not to exceed 25 years.

The second document, the forbearance letter, essentially guaranteed Monycor that the underperforming assets on the thrift's books prior to the acquisition would not be counted against the recapitalized thrift in satisfying its net worth requirements.[3] By its terms, however, the supervisory forbearance was to last only five years, or until December 15, 1991.

The third document, the assistance agreement, required the government to provide cash payments to Monycor to help relieve the losses embedded in the acquired thrift's existing loan portfolio. Thus, under the terms of the agreement, the Federal Savings and Loan Insurance Corporation ("FSLIC") was obligated to provide the thrift with (i) cash in the amount of the thrift's adjusted negative net worth (the difference between its assets and liabilities, after certain agreed-upon adjustments to its balance sheet) and (ii) capital loss coverage, up to $9 million, on losses resulting from the thrift's pre-acquisition, non-performing loan and real estate portfolios.[4] The assistance agreement additionally

2. The "cost" associated with the bids of First Federal and investor plaintiffs related to proposed cash assistance to be made by the government to aid the bank's new owners in remedying the capital impairment inherent in the millions of dollars of substandard loans then held by Barron County.

3. Specifically, the letter promised:

In view of the fact that the acquisition was instituted for supervisory reasons, the Federal Savings and Loan Insurance Corporation will forbear, for a period not to exceed five years following consummation of the acquisition, from exercising its authority under Section 563.13 of the Insurance Regulations [12 C.F.R. § 563.13 (1985)], for any failure of Barron to meet the net worth requirements of Section 563.13 arising solely from an increase in the contingency factor attributable to Barron at the date of acquisition, and any reduction in regulatory net worth resulting from losses on assets or losses on continuing operations acquired in connection with the acquisition....

4. While the timing, characterization and amounts of the assistance payments were initially the subject of dispute, investor plaintiffs advised

specified that the cash paid to the thrift by FSLIC "shall be credited to [Monycor's] net worth account," meaning that such contributions were to be taken into account as a cash component of net worth rather than be treated as an offsetting deduction to supervisory goodwill. The parties refer to the treatment accorded the cash payments as the "capital credit." The assistance agreement additionally incorporated by reference both the FHLBB resolutions and the FHLBB forbearance letter.

On August 9, 1989, Congress passed the Financial Institutions, Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (codified as amended in various sections of 12 U.S.C.). FIRREA had the effect, in part, of preventing Monycor from counting either its capital credit or its unamortized goodwill toward regulatory capital. In addition, FIRREA made it impossible for the thrift to report unreimbursed losses on pre-acquisition assets without also reporting lowered regulatory capital.

Plaintiffs responded to FIRREA in three primary ways. As an initial matter, the thrift submitted a series of capital plans to the Office of Thrift Supervision ("OTS"), the regulatory agency established by FIRREA, proposing means by which the thrift might re-achieve capital compliance. These plans were deemed inadequate, however, in part because they would have failed to meet the Individual Minimum Capital Requirement (a higher-than-normal capital requirement reserved for institutions with higher risk) that OTS was then considering for the thrift.[5] Also in an effort to achieve regulatory compliance, investor plaintiffs contributed an ad-

ditional $600,000 in capital to the thrift pursuant to a net worth maintenance agreement executed as part of the acquisition.[6] Finally, on August 28, 1990, Monycor, Barron Bancshares and investor plaintiffs brought suit in this court alleging, *inter alia*, government's breach of their five-year capital forbearance. Despite those efforts, however, the thrift was seized by the regulators and placed into receivership on July 12, 1991.

Investor plaintiffs now seek compensation for the government's failure to honor the forbearance letter, an amount they identify as $5,350,000 or the sum of their investments ($4,250,000 to acquire interest in the holding company, an additional $500,000 to complete the acquisition, and $600,000 for the capital infusion). The FDIC in turn seeks compensation for lost profits and any consequential damages resulting from the closing of Monycor, an amount it identifies as $14,700,00.[7] Additionally, the FDIC seeks unspecified monetary relief to compensate it for all monies expended and costs incurred by the FDIC and for the value of the benefits conferred on the government.

## DISCUSSION

### Standing

■ As a preliminary matter, defendant offers two challenges to plaintiffs' capacity to bring the present suit. Defendant argues, first, that the FDIC's claim is defective because it constitutes a non-judiciable, intra-governmental dispute and therefore may not be heard by this court. That is the case, defendant explains, because a claim by the FDIC that does not exceed the amount owed to the insurance fund simply contemplates a

the court at oral argument that they were no longer pursuing these claims.

5. The Individual Minimum Capital Requirement was never actually implemented, however, based on the policy of the Supervisory Operations in Washington, DC, of *not imposing such height-ened* requirements on thrifts that were already failing minimum capital requirements.

6. The net worth maintenance agreement obligated the investors, along with the holding company, to maintain the thrift's net worth at a minimum of three percent of the thrift's liabilities, up to a cap of $600,000.

7. The FDIC provided the court with alternate damage calculations, the first purporting to measure the decline in equity value of the thrift ($24,979,819) and the second the market value of the thrift at the time of seizure ($15,800,000). In both cases, the FDIC subtracted the subrogated claim owed to the government (*i.e.*, the costs incurred by the government in satisfying the claims of the thrift's insured depositors) and various administrative expenses to reach damages of $14,700,000 and $5,520,181, respectively.

transfer of funds from one government account to another. Such a claim, defendant continues, may not be adjudicated in this forum. *Landmark Land Co. v. United States*, 256 F.3d 1365, 1380 (Fed.Cir.2001).

Defendant's position, while correctly citing the law, does not take account of the facts. The FDIC in the present case seeks some $24 million in expectation damages, an amount much in excess of the approximately $9 million paid out by the government to cover the thrift's insured deposits. Thus, any recovery would result not simply in a transfer of funds between government agencies, but would also involve additional amounts to be paid out to the thrift's creditors, as well as, perhaps, to its shareholders.[8] The FDIC, as receiver for the failed institution, thus has both a right and a duty to pursue its claims. *Plaintiffs in All Winstar–Related Cases v. United States*, 44 Fed.Cl. 3, 5 (1999).

■ With regard to the standing of investor plaintiffs, however, defendant, urges us to reach a different conclusion. Because both the assistance payments and the accounting forbearances were conferred on the thrift and not on the investors or the holding company, defendant argues that the claims for those amounts belong exclusively to Monycor. *See Glass v. United States*, 258 F.3d 1349 (Fed.Cir.2001) (holding that individual shareholders of a mortgage company that purchased a failing thrift did not have a claim against the United States for breach of contract). In other words, defendant contends, investor plaintiffs have no standing to pursue the present action.

The difficulty with defendant's argument, however, is that it ignores the fact that the investors were contracting parties in their own right. Investor plaintiffs participated, through William Oestreicher, in the contract negotiations, provided the original investment for the thrift's recapitalization, signed a personal net worth maintenance agreement conferring on them an on-going financial responsibility for the thrift, and ultimately signed the contract in their individual capacities.[9] To conclude that parties who have individually signed a contract and who have assumed a financial burden under that contract cannot lay claim to its benefits would seem a strange result indeed. *Accord Hansen Bancorp, Inc. v. United States*, 49 Fed. Cl. 168, 173 (2001) (concluding that shareholders who had signed an assistance agreement were parties to the contract); *Westfed Holdings, Inc. v. United States*, 52 Fed.Cl. 135, 145 (2002) (holding that a shareholder of a thrift who is a party to a contract for regulatory treatment of the thrift may sue to enforce the contract, notwithstanding that the contract's promises are nominally made to the thrift rather than to the shareholder); *Castle v. United States*, 301 F.3d 1328 (Fed. Cir.2002) (holding that investors who had signed a contract in their individual capacities were not entitled to restitutionary damages under the theory they had assumed no financial liability). We therefore conclude that investor plaintiffs may pursue the claims at issue.

*Existence of a Contract*

Turning, then, to the substance of plaintiffs' claims, we begin with the contract itself and the promises it is alleged to contain. In plaintiffs' view, the assistance agreement, the forbearance letter, and the various FHLBB Resolutions formed an express contract that was breached by the passage of FIRREA and by the subsequent seizure of the thrift. Plaintiffs argue that those documents essentially comprised three promises that are now at issue here. First, plaintiffs maintain that

---

8. The distribution priority of creditors is set forth in 12 U.S.C § 1821(d)(11), which specifies that the receiver's administrative expenses are to be paid ahead of all other claims. Only after the FDIC has reimbursed the FSLIC Resolution Fund (a wind-up account created under FIR-REA) for the full amount that the fund paid to insured depositors is the FDIC authorized to make distributions to uninsured depositors or to general creditors. 12 U.S.C. § 1821(d)(11)(A) (1988 and Supp. II 1990).

9. Barron Federal Savings Bank, BCF Mortgage Group, Inc., Barron Bancshares, Inc. (the holding company), FSLIC and the five investors in their individual capacities (William J. Oestreicher, Michael V. Masterson, Scott J. Teigen, Henry C. Martinsen and Donald P. Zietlow) were all signatories to the assistance agreement.

both the assistance agreement and Resolution No. 86–1215 recognized the creation of a capital credit, *i.e.*, an accounting treatment permitting the thrift to record FSLIC's cash payments as a permanent contribution to capital rather than as an offset to supervisory goodwill. Second, plaintiffs argue that Resolution No. 86–1215 permitted the thrift to amortize the goodwill created by the acquisition under the straight-line accounting method for a period not to exceed 25 years. Finally, plaintiffs contend that the forbearance letter granted the thrift a five-year supervisory forbearance, essentially guaranteeing that the underperforming assets that were on the thrift's books prior to the acquisition would not be counted against the recapitalized thrift in assessing its compliance with net worth requirements.

Defendant, for its part, does not seriously dispute the existence of a contract. It argues, however, that the government's obligations under the contract are limited to those forbearances found in the forbearance letter and do not include the goodwill and capital credit plaintiffs now claim. That is the case, defendant contends, because the goodwill and capital credit provisions were not bargained-for, enforceable terms of the agreement, but merely expressions of then-prevailing regulatory policy. In contrast to *Winstar*, 518 U.S. 839, 116 S.Ct. 2432, defendant argues, plaintiffs here bore the risk of regulatory change.

Even were we to accept plaintiffs' interpretation of the contract terms, however, defendant offers numerous arguments as to why the government cannot be held liable for breach. Defendant's primary defense against liability is what it identifies as a prior material breach by investor plaintiffs: gross and chronic mismanagement of the thrift which, defendant contends, relieves the government of its obligation to perform under the contract and absolves it of any responsibility for a subsequent breach. The government is further shielded from liability, defendant maintains, because plaintiffs failed to record goodwill or a capital credit during the

contract term, thereby waiving all rights to their later enforcement. Nor can the goodwill claim give rise to damages, defendant adds, since the elimination of goodwill caused no injury to the thrift. Finally, defendant argues that the five-year, forbearance, though otherwise enforceable, was not breached because the thrift was seized on grounds wholly unrelated to the capital treatment set forth in the forbearance letter. We address these arguments in turn.

I.

Whether the goodwill and capital credit provisions of the agreement remain enforceable in light of subsequent regulatory change is a question that ultimately depends on the contract language itself and on the circumstances surrounding the contract's formation. We cannot ignore, however, the larger context for that inquiry, specifically the decision in *Winstar*, 518 U.S. 839, 116 S.Ct. 2432, and its determination that the government, in granting similar forbearances, in fact intended to assume the risk of regulatory change. Indeed, the *Winstar* decision, plaintiffs urge, is dispositive of the case at hand.

In *Winstar*, the Supreme Court examined three separate supervisory merger transactions which it referred to as Glendale, Winstar and Statesman. Although the Court acknowledged that the question of whether a contract had been created between the thrifts and the government was not strictly before it, the Court went on to endorse the Federal Circuit's finding of a contract based on several considerations.

As an initial matter, the Court rejected the government's argument, raised again here, that certain accounting provisions, including goodwill and capital credits, were statements of regulatory policy rather than contractual commitments, dismissing that assertion as "fundamentally implausible." *Id.* at 862, 116 S.Ct. 2432. Citing language virtually identical to that found in the present assistance agreement,[10] the Court noted that the inte-

---

10. *Winstar's* assistance agreement provided: "This Agreement ... constitutes the entire agreement between the parties thereto and supersedes all prior agreements and understandings of the

parties in connection herewith, excepting only the Agreement of Merger and any resolutions or letters issued contemporaneously herewith." *Id.* at 862, 116 S.Ct. 2432.

gration clause characterized the FHLBB's resolutions and letters "not as statements of background rules, but as part of the 'agreements and understandings' between the parties." *Id.* at 863, 116 S.Ct. 2432.

The Court went on to observe that "the realities of the transaction" favored reading the documents as contractual commitments, specifically that, in the absence of a right to count goodwill as regulatory capital, the merged thrift would have been "subject to regulatory noncompliance and penalties from the moment of its creation," and would have been immediately insolvent as of the date of the transaction. *Id.* (quoting *Winstar Corp. v. United States,* 64 F.3d 1531, 1542 (Fed.Cir. 1995)). From those circumstances, the Court concluded that it would have been "irrational" for the healthy thrift "to stake its very existence upon continuation of current policies without seeking to embody those policies in some sort of contractual commitment," *id.,* and it would have been "madness" for it to have "engaged in these transactions with no more protection than the Government's reading would have given them," *id.* at 910, 116 S.Ct. 2432.

That conclusion was bolstered in the Court's view by the "Accounting Principles" section found in Winstar's assistance agreement (essentially identical to the assistance agreement in the present case): [11]

> Except as otherwise provided, any computations made for the purposes of this Agreement shall be governed by generally accepted accounting principles as applied

on a going concern basis in the savings and loan industry, except that where such principles conflict with the terms of this Agreement, applicable regulations of the [FHLBB] or [FSLIC], or any resolution or action of the [FHLBB] approving or adopted concurrently with this Agreement, then this Agreement, such regulations, or such resolution or action shall govern.... If there is a conflict between such regulations and the [FHLBB's] resolution or action, the [FHLBB's] resolution or action shall govern. For purposes of this section, the governing regulations and the accounting principles shall be those in effect on the Effective Date or as subsequently clarified, interpreted, or amended by the [FHLBB] or the Financial Accounting Standards Board ("FASB"), respectively, or any successor organization to either.

*Id.* at 865, 116 S.Ct. 2432.

In both *Winstar* and the present case, the government emphasized the last sentence of this "Accounting Principles" provision—that the relevant accounting principles may be "subsequently clarified ... or amended"—as barring any inference that the government assumed the risk of regulatory change. In rejecting that argument, the *Winstar* Court observed that it "ignores the preceding sentence providing that the [FHLBB's] resolutions and actions in connection with the merger must prevail over contrary regulations. If anything ... the accounting principles clause tilts in favor of interpreting the

---

Monycor's assistance agreement in turn read: "This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, excepting only the Acquisition Agreements and any resolutions or letters concerning the Acquisitions or this Agreement issued by the [FHLBB] or [FSLIC] in connection with the approval of the Acquisitions and this Agreement...."

**11.** Section 19 of Monycor's assistance agreement, titled "Accounting Principles," read:

> Except as otherwise provided, any computations made for purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, except that where such principles conflict with the terms of the Agree-

ment, applicable regulations of the [FHLBB] or [FSLIC], or any resolution or action of the [FHLBB] approving or relating to the Acquisitions or to this Agreement; then this Agreement, such regulations, or such resolution or action shall govern.... If there is a conflict between such regulations and the [FHLBB's] resolution or action relating to the Acquisitions or to this Agreement, the [FHLBB's] resolution or action shall govern. For purposes of this section, the accounting principles and governing regulations shall be those in effect on the Effective Date, as subsequently clarified or interpreted by the [FHLBB], its staff or the Financial Accounting Standards Board ("FASB"), or any successor organization of the American Institute of Certified Public Accountants ("AICPA").

contract to lock in the then-current regulatory treatment of supervisory goodwill." *Id.*

The *Winstar* Court thus reviewed both the language of the agreements and the totality of the circumstances to conclude that the risk of regulatory change did not fall on the thrifts, but had instead been assumed by the government. Under that reading of the contract, then, the Court construed the goodwill and capital credit provisions as commitments by the government to insure the thrifts against any loss arising from future regulatory change. That conclusion, plaintiffs now urge, is equally applicable in the present case.

The similarities between the Winstar and Monycor transactions are undeniable. Defendant argues, however, that *Winstar* is distinguishable on its facts. Specifically, defendant contends that unlike in *Winstar*, investor plaintiffs did not bargain to count supervisory goodwill or a capital credit as regulatory capital, did not believe they had acquired a right to adopt such an accounting treatment, and did not in fact adopt such a treatment. Indeed, in defendant's view, no aspect of the transaction—the original motivation for the acquisition, the subsequent bid by the investors, the negotiations between the parties, the contract language itself, the parties' conduct during the contract term, or the resulting litigation—supports the contention that either of the parties intended the goodwill and capital credit provisions to be contractually binding. And without such a meeting of the minds, defendant argues, such provisions hold out no promissory commitment.

■ In determining the precise scope of the parties' contractual obligations, we rely, as did the *Winstar* Court, on ordinary principles of contract construction. *See id.* at 870–71, 116 S.Ct. 2432. Thus, in order to prove a binding promise by the government, plaintiffs must demonstrate a mutual intent to contract, including an offer, acceptance, consideration, and authority on the part of the government official entering into the contract. *California Fed. Bank. F.S.B. v. United States*, 245 F.3d 1342, 1346 (Fed.Cir.2001).

It is that mutuality of intent to contract that defendant argues is clearly lacking.

■ In support of that position, defendant offers ample evidence that the assistance payments—and not goodwill or a capital credit—were at the heart of the transaction. In their bid to acquire Barron County, for instance, investor plaintiffs made no mention of purchase accounting, capital credits, or goodwill, but devoted their proposal instead to the amount and type of cash assistance to be provided by FSLIC. Indeed, the investors' bid requested only a single forbearance: the five-year supervisory forbearance later granted in the forbearance letter. Such an omission, defendant notes, contrasts sharply with the three transactions considered in *Winstar*: Glendale, in which the merger proposal assumed the use of purchase method accounting to record supervisory goodwill, and the Merger Agreement was expressly conditioned on FSLIC's allowing Glendale to use the purchase method of accounting; Statesman, whose merger plan called for the use of the purchase method of accounting; and Winstar, whose proposal called for the recognition of supervisory goodwill. *Winstar*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964; *see also First Commerce Corp. v. United States*, 53 Fed.Cl. 38 (2002) (finding that no offer existed where a thrift's application contained no specific request to receive a lengthened period for amortizing goodwill, nor conditioned the merger on the granting of that amortization treatment).

Nor, defendant goes on to say, did the pre-acquisition discussions deal with the topic of goodwill or capital credits, but were concerned, instead, only with the assistance payments. The vast majority of the evidence, defendant emphasizes, indicates that goodwill and the capital credit were not the subject of negotiation at all. *See California Fed.*, 245 F.3d at 1347 (identifying "extensive negotiations" as evidence of an intent by both parties to count supervisory goodwill toward regulatory capital). And while it is undisputed that the resulting agreement nonetheless contained goodwill and capital credit provisions,[12] defendant maintains that the fact

---

**12.** Reference to the capital credit can be found in

both the assistance agreement and FHLBB Reso-

that investor plaintiffs never recorded a capital credit nor maximized their supervisory goodwill is further evidence that those accounting treatments were not an inducement in completing the transaction.[13]

Finally, investor plaintiffs raised no objection, either in their post-FIRREA responses to the regulators or in their original or amended complaints filed in this court, to the loss of their capital credit or goodwill. Prior to the FDIC's intervention in 1997, in fact, the thrift's filings made no mention at all of goodwill or a capital credit, but instead dealt exclusively with the assistance payments and the five-year forbearance. Indeed, counsel for investor plaintiffs repeatedly declared in pre-trial proceedings before this court that the forbearances in *Winstar* were very different from those in the present case, and expressly acknowledged, on one such occasion in 1991, that Monycor did not have supervisory goodwill per se.

That affirmation of the non-*Winstar* character of this litigation is entirely consistent with what we see as the parties' shared understanding of the scope of the contract. Put simply, investor plaintiffs did not pursue either a goodwill or capital credit claim because they did not believe they had a contract right to do so. Only with the FDIC's entrance into this case, some eight years after the passage of FIRREA and six years after the thrift's seizure, were such claims first conceived and introduced into this litigation.

Further, the acquisition documents too reinforce the conclusion that the government

intended to be contractually bound, but only with regard to the assistance payments and to the forbearance set forth in the forbearance letter. FHLBB Resolution No. 86–1215 set forth what the government believed it had contracted for "pursuant to this resolution, the *FSLIC has contracted to provide assistance to Barron* under § 406(f) of the [National Housing Act], 12 U.S.C. § 1729(f) (1982)" (emphasis added). In a section titled "Forbearances," the resolution additionally provided that "the Secretary ... is authorized and directed to send to [the thrift] a letter concerning supervisory forbearance by the [FHLBB] and the FSLIC with respect to certain regulatory requirements." The resulting forbearance letter in turn conferred the five-year supervisory forbearance but made no mention of either a capital credit or goodwill.

Those recitations of intent confirm our conclusion that the assistance payments and the five-year supervisory forbearance constituted the limit of the government's contractual undertaking. The capital credit and goodwill provisions, by contrast, seem merely to set forth the accounting principles then-applicable to the thrift, a distinction wholly in keeping with the government's dual contractual-regulatory role recognized by the Supreme Court in *Winstar*.

Thus, unlike in *Winstar*, where the particular accounting treatments were described as the *"sine qua non* of the [parties'] assent," *Winstar*, 518 U.S. at 921, 116 S.Ct. 2432, and "the principal inducement" to the supervisory mergers, *id.* at 848, 116 S.Ct. 2432, the in-

---

lution No. 86–1215. Section 6(a)(1)(iii) of the assistance agreement provided that "all cash contributions made under this § 6(a)(1) shall be credited to [Barron Federal Savings Bank's] net worth account." FHLBB Resolution No. 86–1215 further specified that "[t]he cash contributions by the FSLIC to [Barron Federal Savings Bank], pursuant to the Assistance Agreement, may be deemed a contribution to net worth and may be booked as a direct credit to [the thrift's] net worth."

Recognition of amortizable goodwill can similarly be found in Resolution No. 86–1215, which provided that "[p]ush-down accounting shall be used to reflect the Acquisition on the books of [Barron Federal Savings Bank] ..." and goes on to specify that "[t]he value of any intangible assets resulting from the Acquisition shall be

amortized by [Barron Federal Savings Bank] over a period not to exceed 25 years by the straight line method...."

13. A review of the thrift's June 1989 Thrift Financial Report, section C, indeed confirms that the thrift had not claimed a capital credit for its FSLIC capital contributions. Nor did the thrift amortize its goodwill over the 25–year period permitted in Resolution No. 86–1215, but instead opted for an accelerated write-off schedule in accordance with Generally Accepted Accounting Principles. As a result, the thrift recorded only $3,664,000 in goodwill in its September 30, 1990 financial reports, rather than the $5,011,706 that it would have had available to it under the 25–year straight line amortization schedule.

stant acquisition stands without regard to either goodwill or a capital credit. Indeed, the evidence overwhelmingly supports the conclusion that the assistance payments— and not goodwill or a capital credit—were the continued focus of the parties' agreement and interactions. Nor, as in *Winstar*, did "a single modification of the applicable regulations ... eliminate virtually all of the consideration provided by the Government," *id.* at 907, 116 S.Ct. 2432: the government paid more than $25 million in assistance payments over the contract term.

In the absence, then, of any indication that investor plaintiffs requested a capital credit and amortizable goodwill, that the parties negotiated for those accounting treatments, that the government evidenced an intent to be contractually bound by those provisions or that plaintiffs acted in a manner consistent with possessing those contract rights, we cannot conclude that this case is governed by *Winstar*.[14] The goodwill and capital credit provisions, though incorporated into the contract by the integration clause, are simply regulatory in nature. They reflect FSLIC's responsibility as overseer of the acquisition and identify the accounting standards that are to govern in the subsequent operation of the thrift. Not all of the provisions set forth in the acquisition documents, in other words, can be assigned promissory content or shift the risk of regulatory change to the government when the fundamental criteria for a bargained-for exchange are lacking.

In the FDIC's view, however, our version of the story is incomplete.[15] Omitted from

this recounting of the negotiations is the fact that the regulators provided the investors with a FHLBB release, SP–37, which described the standard forbearances, including both goodwill and capital credits. The FDIC additionally cites a memorandum from Kevin T. O'Connell, the government's principle negotiator, in which he suggests to his supervisory agent that the FHLBB "offer various forbearances in return for the above-mentioned changes in the Oestreicher bid." Finally, the FDIC refers to Mr. Oestreicher's notes of a telephone conversation with Mr. Brick, FSLIC's primary negotiator in Washington, DC, in which Mr. Oestreicher noted that "Fed cash assistance (payment for negative NW [net worth]) is treated as RAP [regulatory accounting principle] NW which when added to our $4.75 MM, NW will equal or exceed the 5% [net worth requirement]."

None of these documents, however, changes our conclusion that the goodwill and capital credit provisions were simply incidental terms of the agreement that were neither bargained for nor promissory in character. SP–37, for instance, was an internal memorandum from the Office of Examinations and Supervision that set forth guidelines "to expedite the processing of supervisory or assisted mergers and acquisitions and to diminish the inordinate amount of staff time presently necessitated to negotiate the terms of forbearance letters with potential acquirers of institutions." The memorandum contained "standard forbearance language" and divided possible forbearances into three categories: those that "will be granted," those

---

14. In reaching this conclusion, we do not suggest that the *Winstar* decision did not inform both our reasoning and our ultimate holding. We recognize, for instance, that the Court interpreted the integration and the accounting principles clauses then before it (both virtually identical to the ones in the present case) as supporting the contention that the government intended the goodwill sections of the agreement to have a promissory intent. We have no quarrel with that conclusion in the *Winstar* context, where the provisions simply reinforced the Court's finding that the transactions would have made no economic sense without construing the goodwill treatment as a contractual undertaking. As discussed above, however, we do not believe that to be our case: the economic center of this transaction lies elsewhere.

15. The FDIC additionally objects to this line of inquiry under the theory that it violates the parole evidence rule, citing *Cooper Realty Co. v. United States*, 36 Fed.Cl. 284, 289 (1996) (precluding the admission of prior or contemporaneous evidence to alter the terms of a written agreement when the parties have adopted the agreement as the expression of their final intent). The FDIC accordingly urges that we not look beyond the language of the contract, but instead accept it on its face. This is not, however, a case of using extrinsic evidence to modify a contract's terms. Instead, we rely on the contemporaneous dealings for evidence as to the parties' intent, not to alter the parameters of an existing contract provision, but to determine whether such a provision was intended to possess contractual significance in the first instance.

that "may be granted on a case-by-case basis if circumstances so justify," and those that "will not be granted."

Included in Section I (forbearances that "will be granted") was a clause virtually identical to the provision requested by plaintiffs in their bid and set forth in their forbearance letter.[16] Among the forbearances identified in Section II (those that "may be granted") were a capital credit and the amortization of goodwill.[17] SP–37, however, stressed, that "[r]equests for forbearances outlined in Section II will likely be rejected unless they are shown to be key factors in helping to solve exceptionally difficult supervisory cases." The memorandum additionally noted that "forbearances, beyond those outlined in Section I, must be convincingly justified. Blanket requests for forbearances (*i.e.,* all available forbearances) are not acceptable."

Rather than supporting the FDIC's position, then, SP–37 only serves to undermine it. The specifics of an internal procedural memorandum can hardly be viewed as evidence of contract negotiations between the parties, even if such a document was presented to plaintiffs directly. Nor can the terms of the memorandum have given rise to a legitimate expectation that goodwill and a capital credit would be included in the contract in light of the admonition that such forbearances would "likely be rejected" unless shown to be "key factors" in resolving "exceptionally difficult" cases. This is particularly true since the accounting treatments at issue were not even requested, let alone "convincingly justified" in investor plaintiffs' bid.

The O'Connell memorandum suffers from similar infirmities. As with SP–37, such an internal document—even one that raises the possibility of contract negotiations—provides scant, if any, proof that such negotiations in fact occurred. Indeed the O'Connell memorandum makes no specific mention of goodwill or a capital credit, and at no time specifies exactly what forbearances would be made the subject of the bargain. And it should additionally be noted that at least one of the proposed changes suggested in the O'Connell memorandum—the reduction of the cap on covered asset losses from $9 million to $5 million—was never implemented. Given these realities, we find it difficult to conclude that the O'Connell memorandum evidences any intention by the parties to be bound with regard to goodwill or a capital credit.

In contrast to SP–37 and the O'Connell memorandum, Mr. Oestreicher's notes at least support the FDIC's position. Mr. Oestreicher's notation that the cash assistance payments could be counted toward net worth under regulatory accounting principles confirms that the capital credit was at minimum the subject of discussion. That observation is insufficient, however, to counter the overwhelming body of evidence that neither party intended the particular accounting treatments to be elevated into promissory assurances.

## II.

■ Having established what the contract did not guarantee, we turn then to what it

---

**16.** Listed under Section I was a forbearance titled A–2, which provided:

[I]n view of the fact that the acquisition was instituted for supervisory reasons, [FSLIC] will forbear, for a period of five years following consummation of the acquisition, from exercising its authority under Section 563.13 of the Rules and Regulations for Insurance of Accounts, for any failure of (acquired institution) to meet the net worth requirements of Section 563.13 arising solely from scheduled items of (acquired institution) at the date of acquisition.

**17.** Section II included the following forbearances:

It is the Corporation's intention that the cash contribution to be made to (resulting institu-

tion) pursuant to an assistance agreement to be entered into between the FSLIC and (resulting institution) is to be a credit to (resulting institution's) net worth; therefore, for regulatory accounting purposes, (resulting institution) may book such contribution as a direct addition to its net worth. This forbearance generally will be granted upon the request of the resulting institution in a supervisory merger. For purposes of reporting to the Board, the value of any intangible assets resulting from accounting for the merger in accordance with the purchase method may be amortized by (resulting institution) over a period not to exceed ( ) years by the straight line method. This forbearance generally will be granted upon the request of the resulting institution in a supervisory merger.

did.[18] As discussed above, the investors requested a single forbearance during the negotiations, asking that "FSLIC forbear, for a period of five years following consummation of the acquisition, from exercising its authority under 563.13 of the Rules and Regulations for Insurance of Accounts, for any failure of the association to meet the net worth requirements of Section 563.13 arising solely from scheduled items which were assets of the association at the date of acquisition."

Defendant readily concedes that the resulting five-year forbearance—requested in the bid, discussed by the parties, and conferred in the forbearance letter—is indeed a contractually binding term. Defendant argues, however, that even if the government had breached that forbearance—a charge it denies—plaintiffs are precluded from recovering damages on the grounds that they committed a prior material breach, or in the alternative, that they materially misrepresented their expected method of operation in their application for the thrift's acquisition. That is the case, defendant explains, because the private plaintiffs failed to operate the thrift in the manner they had promised by engaging in risky construction lending, failing to build net worth, maintaining an inadequately constituted board of directors and violating various statutory directives, all in contravention of assurances made in both their bid and the contract.

In support of this position, defendant relies on a statement in investor plaintiffs' bid that "[i]t is the intention of the Acquirors to restore the association to a more conservative style of operation and to pursue the traditional lines of business for savings and loan associations with emphasis on local residential mortgage financing." Similarly, defendant points to plaintiffs' business plan in which the investors promised, *inter alia*, a "de-emphasis of large commercial and development real estate loans with corresponding re-emphasis of residential real estate loans and consumer loans."

In spite of this promise, however, defendant charges that investor plaintiffs almost immediately implemented a practice of reckless lending. Defendant cites, for instance, what it calls the thrift's "disastrous decision" to enter into the construction loan business, specifically by opening an office on the premises of a lumber yard owned by one of the original investors and extending unsecured loans to the lumberyard's uncreditworthy customers. Indeed, in a letter dated June 23, 1989, the FHLBB noted after a field visit to review the thrift's lending activity that "[w]e question the prudency of the institution's recent practices of lending large sums of funds on an *unsecured basis* to friends and interests of Chairman Zietlow." In defendant's view, the majority of the thrift's "classified" (*i.e.*, under-performing) assets as of 1991 were the result of this construction lending program.

Defendant further argues that the loans made to Mr. Zietlow's business associates, in addition to constituting risky lending, represent a violation of the parties' "Stipulation Concerning Directors and Officers." In that stipulation, the investors had agreed that "[a]ny officer, director or 10 percent stockholder of Savings Bank or Holding Company or any subsidiary of Savings Bank, who is also engaged in the business of real estate development, building or construction, may not secure financing for such business from Savings Bank." In addition, the stipulation provided that the board of directors of the thrift was to include at least nine members, no more than one-third of whom were to be salaried officers or employees of the bank. In contravention of this directive, however, Monycor's board of directors consisted of only the five original investors, all of whom were paid salaries by the thrift.

As further evidence of plaintiffs' alleged breach, defendant argues that rather than building net worth as anticipated by the business plan, the investors instead extracted all of the thrift's economic income in its initial years of operation. In its 1987 report summary, for instance, Monycor's board of di-

---

18. Because we conclude that plaintiffs were not guaranteed the continued use of goodwill and capital credit in the face of a changing regulatory regime, we need not reach defendant's argument that plaintiffs waived those rights by failing to exercise them or, in the alternative, that any breach is non-compensable because the phase-out of goodwill caused the thrift no harm.

rectors declared a total of $1,011,771 in dividends to its holding company, despite the fact that only $838,777 of the $2 million reported net income was actually economic income, *i.e.*, income not created by accounting adjustments. Similarly, in its 1988 report of examination, the FHLBB noted that the board had made "[d]ividend payments totaling $1.6 million ... since the institution's conversion on December 16, 1986," even though the economic income for that period was only $900,000. In 1989, the regulators directed Monycor to stop declaring dividends.

Finally, Section 13(f) of the assistance agreement required Monycor to comply with "all applicable statutes, regulations, orders of, and restrictions imposed" by relevant agencies. In the three years following the acquisition, however, Monycor was cited for a number of statutory and regulatory violations, including a violation of 12 C.F.R. § 563.43 (prohibiting unsecured loans to a person affiliated with an investor); 12 C.F.R. §§ 563.41(b), (c) (prohibiting the purchase of an interest in a loan from an affiliated person without approval of the regulators); and sections 23A and 23B of the Federal Reserve Act, 12 U.S.C §§ 371c, c–1, (for making an unsecured advance from Monycor to the holding company).

Despite the alleged violations, however, this is not, as defendant suggests, a case in which a contract "is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying," Restatement (Second) of Contracts § 164 (1981), or in which "[a] party who has been induced to enter into a contract by a material misrepresentation ... is entitled to repudiate all of the contract provisions." *Pacific Architects and Engineers Inc. v. United States*, 203 Ct.Cl. 499, 491 F.2d 734, 742 (1974). The decision by the investors to expand the thrift's lending

program into the Minnesota markets, a program that plaintiffs dispute was unprofitable, does not so violate the broad mission statement of emphasizing local real estate loans so as to constitute fraud or material misrepresentation. Business plans must necessarily be flexible and responsive to changes in business climate. And such a policy statement is simply too general to support a finding that the particular business decision sufficiently departed from the business strategy as to amount to fraud.

Nor can we characterize plaintiffs' other actions as giving rise to a claim of misrepresentation or prior material breach. Defendant offers no evidence to suggest that the incidents of which it now complains were integral to the contract, or that investor plaintiffs' alleged transgressions were anything other than regulatory violations. In the event of a regulatory violation, the government had available to it—and indeed exercised—remedies far less extreme than the abandonment of the contractual relationship. Had plaintiffs' actions been adequate grounds to void the contract, then surely they would have provided ample justification for seizing the thrift immediately upon their discovery by OTS. Instead, however, the regulators provided repeated instruction to the thrift on how to ameliorate the very problems the government now attempts, unconvincingly, to label a material breach.[19]

Even were the court to conclude that investor plaintiffs' actions rose to the level of a material breach, however, it does not inevitably follow that the government would thereby be freed of liability for any breach on its part. As the Court of Claims explained in *Cities Service Helex, Inc. v. United States*, 211 Ct.Cl. 222, 543 F.2d 1306, 1313 (1976):

A material breach does not automatically and *ipso facto* end a contract. It merely gives the injured party the right to end the agreement; the injured party can choose

---

19. As early as the FHLBB's November 10, 1988 report of examination, for instance, the regulators expressed concern that Monycor's policies for evaluating potential commercial/construction loans were inadequate. The report additionally concluded that Monycor's overall asset quality was "questionable" and recommended that performance of the new loans should be "closely

monitored by management and reassessed by the examiners at the next examination after a performance history has been established." Such regulatory oversight was indeed the appropriate means of dealing with difficulties that the regulators at all times treated as regulatory rather than contractual violations.

between canceling the contract and continuing it. If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term (to put him in the position he would have occupied if the contract had been completed). If he elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach.

*See also Grady–Gould Watershed Improvement Dist. v. Transamerica Ins. Co.,* 570 F.2d 720, 723 (8th Cir.1978) (A party to a contract may waive a breach of contract by the other party, even a material breach, and then be liable for his own subsequent breach.).

The government in the present case continued to make payments under the assistance agreement until those obligations were completed in December 1991. This fact is particularly striking in light of our conclusion that the assistance payments lay at the very heart of the contractual undertaking. Indeed, at *no time* did the government suggest that plaintiffs were in violation of their contract. Thus, as in *Coast–to–Coast Fin. Corp. v. United States,* 52 Fed.Cl. 352, 363 (2002), the government "continued performance under the contract despite perceived material breaches.... The Agreement terminated by its own terms ... despite the government's argument that the investor plaintiffs breached it years before. The government did not reserve any claim of prior breach and did not bring up the question until long after this litigation commenced. Under any construction of the applicable law, the government's actions preclude it from raising the defense."

## III.

■ Even if the mismanagement by investor plaintiffs did not rise to the level of a prior material breach, defendant nonetheless identifies such mismanagement as the cause of the thrift's ultimate seizure. And because, in defendant's view, it was investor plaintiffs' flawed management decisions—and not a refusal to honor the five-year supervisory forbearance—that jeopardized the thrift's safety and soundness, defendant maintains that the government cannot be held liable for a breach of the forbearance letter.

Surprisingly, we are given little guidance on this point by either party, a fact we attribute to the constantly shifting nature of this litigation. Defendant notes correctly, however, that the forbearance letter did not insulate the thrift against increases in capital levels made necessary by safety and soundness concerns.[20] Nor did the letter require that post-acquisition losses be exempted from regulatory capital write-downs.[21] Monycor's difficulties, in defendant's view, were the result of substandard loans originated *after* the acquisition. Ultimately, defendant argues, Monycor would have failed capital requirements even if the losses associated with the forbearances were excluded from the computation of regulatory net worth.

In evaluating defendant's argument, we note first that by the government's own admission, the five-year forbearance, as of March 12, 1991, amounted to some $1.9 mil-

---

**20.** The forbearance letter provided:

> The forbearances or waivers extended by this letter do not relieve Barron of its continuing obligations to maintain records of its reserve and net worth condition and to report its financial condition in accordance with applicable regulatory requirements. This letter does not and shall not be construed to constitute forbearance or waiver by the [FHLBB] or [FSLIC] with respect to any regulatory or other requirements other than those encompassed within the preceding paragraphs I through 2. Other than actions to enforce the regulatory requirements waived in accordance with paragraphs 1 through 2 and the *statutory* provisions authorizing imposition of the waived re-

quirements, insofar as such requirements are waived, the [FHLBB] and [FSLIC] expressly reserve all of their statutory rights and powers with respect to Barron, including, without limitation, those under Section 5 of the Home Owners' Loan Act of 1933, as amended, and Sections 406 and 407 of the National Housing Act, as amended.

**21.** The forbearance applies to failures in meeting net worth requirements "arising solely from an increase in the contingency factor attributable to Barron at the date of acquisition, and any reduction in regulatory net worth resulting from losses *on assets or losses on continuing operations* acquired in connection with the acquisition."

lion. Indeed, in its report of examination dated March 12, 1991, OTS acknowledged that although Monycor was failing its three capital requirements, "the institution is subject to a forbearance agreement which adds approximately $1.9 million back to capital when making the calculation. *The forbearance places the bank close to compliance.*" (Emphasis added.) This concession, in plaintiffs' view, demonstrates that but for the loss of the supervisory forbearance, Monycor would not have been seized.

In further support of this position, plaintiffs point to a letter dated December 6, 1990 from Susan T. Mooney, an OTS supervisory agent, to Joan Bernott at the United States Department of Justice's Special Litigation Section. The letter advised that if the capital forbearance granted in the forbearance letter were in effect, the thrift would exceed the minimum capital requirements under FIRREA for the quarter ending September 30, 1990. Ms. Mooney went on to note, however, that "we believe minimum requirements are not adequate for Monycor."

This evidence, however, is insufficient to demonstrate that the thrift was seized as a result of a capital impairment attributable to the government's failure to honor the supervisory forbearance. Quite the opposite, reports by the FDIC detail an institution whose safety and soundness was compromised by a myriad of problems unrelated to losses on pre-acquisition assets. In its March 8, 1991 report of examination, for instance, the FDIC noted:

> The institution and institution holding company directors have displayed a disregard for basic fiduciary, operating, and lending principles acceptable for an insured depository institution. Management has not demonstrated its ability and willingness to operate the institution in a profitable and prudent manner. The directors' engagement in hazardous and objectionable practices including, concentrated speculation in the Twin Cities area real estate market, creation and condonation of conflicts of interest, excessive and unsupported insider remuneration, and questionable accounting and audit practices, have resulted in an insolvent institution. The institution is

now operating with deficit tangible capital, operating losses, an inadequate general valuation allowance, excessive volume of adversely classified assets, inadequate liquidity, and in violation of several federal regulations.

> The absence of outside directors (the five directors control 100% of the institution's stock) added fuel to this adverse situation as the directorate apparently had only their own interests to serve.

Following the issuance of the FDIC's examination report, OTS issued a memorandum dated June 14, 1991, identifying three grounds for appointing a receiver. Under the first category, titled "Substantial Dissipation of Assets or Earnings Due to Any Violation or Violations or Law or Regulations, or to Any Unsafe or Unsound Practice or Practices," the memorandum listed ongoing losses associated with the Minnesota loan program, and "management's questionable actions to create the appearance of regulatory capital compliance." Under the second category, titled "Unsafe or Unsound Condition to Transact Business; Substantially Insufficient Capital," the memorandum concluded that "Monycor's capital levels are substantially insufficient, creating an unsafe and unsound condition to transact business." Finally, under the third category, titled "The Association has Incurred or is Likely to Incur Losses that will Deplete All or Substantially All of its Capital," the memorandum noted the thrift's "high level of classified loans and non-earning assets," amounting to a total $9.8 million, the major portion of which (some $7.6 million) the memorandum earlier identified as "loans secured by Minnesota real estate," *i.e.,* post-acquisition loans.

The memorandum went on to note:

> Supervisory meetings have been held and supervisory letters have been sent regarding the concerns at Monycor. Because of the weak condition at Monycor (namely the extremely low tangible capital position), the large percentage of classified assets to total assets, management's questionable actions to create the appearance of regulatory capital compliance, and the weakness of management as described below, we

requested Monycor's board of directors to execute a Consent Capital Directive ("Directive") on June 28, 1990 and again on September 19, 1990. However, the board of directors has refused to sign the Directive.

In addition, we believe that Monycor needs more than minimum capital. Accordingly, on September 19, 1990, we requested the Deputy Director for Supervisory Operations to impose an Individual Minimum Capital Requirement ("IMCR"), calling for higher capital based on Monycor's high level of classified assets.

It is important to repeat here that while plaintiffs may have been guaranteed the supervisory forbearance, they were not made exempt from safety and soundness restrictions, nor from the resulting increases in capital requirements that a higher risk institution might require. All indications point to the conclusion that the problems at Monycor were of investor plaintiffs' own making. As of the March 12, 1991 report of examination, for instance, more than half of the qualified (*i.e.*, non-performing) assets were loans to Minnesota borrowers (loans secured by Minnesota real estate comprised over $7.4 million of the "Substandard and Doubtful" classifications and over $250,000 of the "Loss" classifications) and delinquencies had increased significantly since the November 24, 1989 report of examination.

And while the June 14, 1991 memorandum acknowledges that the complaint then pending before this court seeking additional assistance payments "will greatly affect Monycor's capital levels and its future viability," those are precisely the payments that plaintiffs inexplicably announced—as late as oral argument and with no prior or subsequent written notice—that they are electing not to pursue. Plaintiffs cannot now rely on allegations for which they have provided no support and the truth of which they have elected not to test.

Even were that not the case, however, the evidence suggests that those payments would not have made a difference. As of its December 1990 financial report, for instance, the thrift was failing its tangible capital requirement and its risk-based capital require-

ment even with the inclusion of the FSLIC receivable balance—the remaining funds the thrift earlier claimed were still owed to it as a result of the government's promise to relieve the thrift of its pre-acquisition losses.

*Wrongful Termination of Employment*

In their final count, plaintiffs sue for damages in connection with the termination of Mr. Oestreicher's employment as Monycor's president. In asserting a claim for what they call a "wrongful termination," plaintiffs do not contend that Mr. Oestreicher's removal from position was in violation of a formal contract of employment. Rather, plaintiffs maintain that Mr. Oestreicher's loss of salary and other employment-related benefits are elements of the damages reasonably identifiable with the alleged breach by the government of its forbearance commitment and resulting seizure of the thrift. In other words, plaintiffs seek these employment-based damages as losses that the government, as the alleged breaching party, could have expected to occur in the ordinary course of events.

Defendant counters that the Resolution Trust Corporation (RTC) terminated Mr. Oestreicher's employment in its receivership capacity and was thus not acting as a government instrumentality. On that ground alone, defendant argues, the United States cannot be sued for the RTC's actions. *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 85, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). Additionally, 12 U.S.C § 1464(d)(2)(E) specifies that any challenge to a receiver's actions must be made before a district court, thereby rendering this court without jurisdiction to hear Mr. Oestreicher's claim. Finally, defendant argues that Mr. Oestreicher's claim sounds in tort, rather than in contract, and therefore may not be heard in this forum.

Though defendant may well be correct as to the various arguments it has raised in opposition to this wrongful termination claim, we find it unnecessary to consider them. It is enough here to say that since we have rejected plaintiffs' primary contention—asserting a breach of contract—it follows that any right to damages similarly must be rejected.

**326**

## CONCLUSION

In many respects, this case bears scant resemblance to the *Winstar* line of cases. The gravamen of the original complaint—FSLIC's failure to make timely payments and the interest and opportunities lost as a result—had taken full form as early as August 1987, two full years before the passage of FIRREA. Those payments indeed remained the focus of the litigation until the intervention by the FDIC on March 27, 1997.

Both the language and the circumstances of the transaction point to a single conclusion: that the capital credit and amortizable goodwill were not bargained-for elements of the contract. As such, those provisions made no promises regarding future regulatory treatment and cannot therefore be seen as shifting the risk of regulatory change to the government.

Nor can the government be held liable for a breach of the forbearance letter. We reach that conclusion based not on the fact that mismanagement by the investors rose to the level of a prior material breach, but because those same poor management decisions contributed to the thrift's decline and led ultimately—and independent of the supervisory forbearance—to its seizure.

Finally, absent any viable claim for breach of contract, there can exist no subordinate claim to damages for an alleged wrongful termination of employment.

Thus, for the reasons stated, the court (i) grants Defendant's Motion for Partial Summary Judgment, dated September 16, 1999; (ii) grants Defendant's Motion to Dismiss Portions of the Complaints, dated September 16, 1999; (iii) denies Plaintiff Federal Deposit Insurance Corporation's Motion for Partial Summary Judgment on Liability, dated February 19, 1999 and (iv) denies Investors' Renewed Motion for Summary Judgment as to Liability, dated November 9, 1999.

Consistent with the foregoing, the Clerk is directed to enter judgment, pursuant to Rule 54(b), dismissing Counts One through Eight and Count Eleven of investor plaintiffs' amended complaint, and Count Three of plaintiff-intervenor FDIC's complaint. Plaintiffs' Fifth Amendment Taking and Due Process claims (investor plaintiffs' Counts Nine and Ten and plaintiff-intervenor FDIC's Counts One and Two) have been reserved by the parties for a later proceeding.