366 F.3d 1360
 BARRON BANCSHARES, INC., William J. Oestreicher, Michael V. Masterson, Scott J. Teigen, Henry C. Martinsen and Donald P. Zietlow, Plaintiffs-Appellants, and
Federal Deposit Insurance Corporation, Plaintiff-Appellant,
v.
UNITED STATES, Defendant-Appellee.
 No. 03-5048.
 No. 03-5049.
 United States Court of Appeals, Federal Circuit.
 DECIDED: May 11, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Susan E. Barnes, Lindquist & Vennum PLLP, of Minneapolis, Minnesota, argued for plaintiffs-appellants Barron Bancshares, Inc., et al. Of counsel on the brief were Mark J. Briol and William G. Carpenter, Briol & Associates, PLLC, of Minneapolis, Minnesota.
 Ellis Merritt, Jr., Federal Deposit Insurance Corporation, of Dallas, Texas, argued for plaintiff-appellant Federal Deposit Insurance Corporation. On the brief were John V. Thomas, Mary Ann McNamar, John M. Dorsey III, and Richard M. Schwartz, FDIC Legal Division, of Washington, DC.
 Tarek Sawi, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General; David M. Cohen, Director; Jeanne E. Davidson, Deputy Director; and Richard B. Evans and Joanne E. Johnson, Trial Attorneys.
 Before NEWMAN, LOURIE, and SCHALL, Circuit Judges.
 SCHALL, Circuit Judge.
 
 
 1
 In this Winstar-related case, Barron Bancshares, Inc. ("Barron Bancshares"), and Mssrs. Oestreicher, Masterson, Teigen, Martinsen, and Zietlow ("Investors") (collectively, "Barron") and the Federal Deposit Insurance Corporation ("FDIC")[1] appeal from the decision of the United States Court of Federal Claims (i) granting partial summary judgment in favor of the United States and (ii) granting the United States' motion to dismiss counts one through eight and eleven of Barron's first amended complaint and count three of the FDIC's complaint. Barron Bancshares, Inc. v. United States, 53 Fed.Cl. 310 (2002). The court determined that the capital credit and goodwill provisions in Barron's Winstar-type contract with the United States were not contractual obligations, but merely statements of then-applicable regulatory accounting principles. Id. at 315-20. The court further determined that the United States was not liable for its breach of the five-year forbearance provision of the contract by reason of the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101-73, 103 Stat. 183 (codified in scattered sections of 12 U.S.C. and 26 U.S.C.) ("FIRREA"), and its implementing regulations. Id. at 323-25. The court concluded that although the United States breached the forbearance provision of the contract, that breach was not the cause of the seizure of Monycor, the thrift institution acquired by Barron pursuant to its contract with the United States. Id.
 
 
 2
 We conclude that the supervisory goodwill and capital credit provisions of Barron's contract with the United States were contractual obligations, and that the United States breached those obligations. In addition, while we agree with the Court of Federal Claims that the United States breached the contract's five-year forbearance provision, we conclude that there are genuine issues of material fact as to whether that breach caused the seizure of Monycor. The decision of the Court of Federal Claims is therefore affirmed-in-part and reversed-in-part. The case is remanded for further proceedings consistent with this opinion.
 
 BACKGROUND
 I.
 
 3
 The circumstances surrounding the thrift crisis of the early 1980s and the resulting enactment of FIRREA have been extensively set forth in opinions of the Supreme Court, this court, and the Court of Federal Claims. See United States v. Winstar Corp., 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) ("Winstar IV"); Winstar Corp. v. United States, 64 F.3d 1531 (Fed.Cir.1995) (en banc) ("Winstar III"); Winstar Corp. v. United States, 25 Cl.Ct. 541 (1992) ("Winstar II"); Winstar Corp. v. United States, 21 Cl.Ct. 112, 113-14 (1990) ("Winstar I"). A brief summary of these circumstances may provide context for this particular Winstar-related dispute.
 
 
 4
 Rising interest rates during the 1980s led to the insolvency of many savings and loan institutions ("thrifts"). To attract new deposits, thrifts had to offer interest rates that far exceeded the income the thrifts were receiving from mortgage agreements previously entered into at lower rates. Castle v. United States, 301 F.3d 1328, 1332 (Fed.Cir.2002). Between 1981 and 1983, more than four hundred thrifts declared bankruptcy. This threatened to exhaust the insurance fund of the Federal Savings and Loan Insurance Corporation ("FSLIC"), the agency charged with regulating the federally insured thrift industry and insuring consumer deposits in thrifts. Winstar IV, 518 U.S. at 846-47, 116 S.Ct. 2432.
 
 
 5
 To deal with this crisis, the Federal Home Loan Bank Board ("FHLBB" or "Bank Board"), the agency authorized to charter and regulate federal savings and loan associations, encouraged healthy thrifts and outside investors to purchase insolvent thrifts in supervisory mergers. Id. at 847, 116 S.Ct. 2432. In such a transaction, the FHLBB would permit the acquiring investors to allocate any shortfall between liabilities and real assets to an intangible asset known as "supervisory goodwill." See Landmark Land Co., Inc. v. FDIC, 256 F.3d 1365, 1370 (Fed.Cir.2001). The Bank Board would then allow the new or restructured thrift to count supervisory goodwill toward its reserve capital requirements, and to amortize the goodwill over a long period of time. Winstar IV, 518 U.S. at 849-50, 116 S.Ct. 2432. In addition, the FSLIC offered cash contributions in the form of capital credits that acquiring thrifts were permitted to count as permanent credits to regulatory capital. Id. at 853, 116 S.Ct. 2432. Finally, banking authorities granted regulatory forbearances whereby they would forbear from enforcing a thrift's regulatory capital requirements for a specified period of time. See, e.g., Cal. Fed. Bank, FSB v. United States, 245 F.3d 1342, 1345 (Fed.Cir.2001) ("Cal Fed") (the Brentwood and Family transactions).
 
 
 6
 Despite these various measures, the crisis in the savings and loan industry continued. As a result, on August 9, 1989, Congress enacted FIRREA, in order to prevent the collapse of the industry, to attack the causes of the crisis, and to restore public confidence. Winstar IV, 518 U.S. at 856, 116 S.Ct. 2432. FIRREA abolished the FHLBB and the FSLIC, transferred thrift insurance activities to the FDIC, established the Office of Thrift Supervision ("OTS") as the new thrift regulatory agency, created the Resolution Trust Corporation ("RTC") to liquidate or otherwise dispose of certain closed thrifts and their assets, and made substantial changes in the regulation of the savings and loan industry. Id. In particular, FIRREA mandated a minimum capital requirement for thrifts and prohibited the use of supervisory goodwill. In its wake, many thrifts rapidly fell out of compliance with regulatory capital requirements and were seized by regulators. Id. at 856-58, 116 S.Ct. 2432.
 
 II.
 
 7
 Barron County Federal Savings & Loan ("Barron County"), an ailing thrift located in Barron, Wisconsin, reported insolvency on May 31, 1985. Barron Bancshares, 53 Fed.Cl. at 311. In response, the Chicago office of the FHLBB decided to recapitalize Barron County by converting it from a mutual association to a stock association and by selling its stock. Id. at 311-12. After soliciting bids, the Bank Board selected the Investors to acquire the stock of the reformed thrift, renamed Monycor. Id. at 312. The transaction was recorded in five documents: three Bank Board Resolutions, an Assistance Agreement, and a Forbearance Letter. Id.
 
 
 8
 In Bank Board Resolution Nos. 86-1215, 86-1215A, and 86-1215B, the FHLBB authorized the conversion of the thrift, the purchase of stock by the Investors, the execution of the Assistance Agreement, and the issuance of the Forbearance Letter. Id. Resolution No. 86-1215 contained the various accounting principles applicable to the recapitalized thrift, including the capital credit and supervisory goodwill provisions at issue in this case. Id. It directed the thrift to use the "push-down" accounting method to record the value of the acquisition on its books. Id. Under that method, the thrift's assets were to be "marked to market," or valued as of the date of the transaction. Id. Application of this accounting method resulted in an excess of liabilities over assets, creating $5,907,708 in supervisory goodwill that Monycor was to record as an intangible asset. Id. Of this sum, $4,908,000 constituted unallocated goodwill that Monycor could count toward its regulatory capital requirements. Id. The supervisory goodwill provision contained in the Resolution provided for any intangible assets created by the acquisition to be amortized by the straight-line method over a period not to exceed twenty-five years. Id. Resolution No. 86-1215 further established that the Investors were entitled to record a capital credit equal to the ultimate contribution by the FSLIC. Id. at 318 n. 12.
 
 
 9
 Pursuant to section 6(A)(1) of the Assistance Agreement, the FSLIC contributed cash to Monycor to assist the Investors in making it a viable institution. Id. The Investors were to contribute $4.25 million, see id., while the FSLIC was to contribute $6.675 million, subject to adjustment based on the Initial Audit mandated by section 5 of the agreement. Assistance Agreement § 6(A)(1). The FSLIC ultimately contributed approximately $9.7 million to Monycor. See Barron Bancshares, 53 Fed.Cl. at 314.
 
 
 10
 Section 6(A)(1)(iii) of the Assistance Agreement related to capital credit; it classified cash paid to the thrift by the FLSIC as a cash component of net worth rather than an offsetting deduction to supervisory goodwill. Id. at 312-13. The Assistance Agreement also incorporated the accounting principles stated in the three Bank Board Resolutions. Id. Section 19 of the agreement stated that the regulations applicable to the transaction were those in effect at the time of the transaction, id. at 316 n. 11, while section 24 of the agreement set forth an integration clause that incorporated the Bank Board Resolutions and the Forbearance Letter and excluded from the parties' contract all parol agreements and discussions. Id. at 316 n. 10.
 
 
 11
 The Forbearance Letter completed the set of five documents constituting the contract. In it, the United States guaranteed Monycor that the under-performing assets on its books prior to the acquisition would not be counted against the recapitalized thrift in satisfying its net worth requirements for five years, until December 15, 1991. Id. at 312. The Forbearance Letter also specified the accounting treatment of losses on assets and operations acquired from Monycor's predecessor. Id. at 312 n. 3.
 
 
 12
 Upon completion of the acquisition, the Investors became the Board of Directors of Monycor and Barron Bancshares, Monycor's holding company, with Mr. Oestreicher serving as Monycor's President. During its operation, Monycor adhered to Generally Accepted Accounting Principles ("GAAP"), which include the "push-down" or "purchase" method of accounting set forth in Bank Board Resolution No. 86-1215. Monycor never recorded a capital credit during its existence, nor did it amortize its goodwill in accordance with the Bank Board Resolutions. Id. at 318 n. 13. Rather, Monycor opted for an accelerated write-off schedule in accordance with GAAP. Id.
 
 
 13
 In December of 1989, the OTS informed Monycor that it had failed FIRREA's capital requirements.[2] Shortly thereafter, in January of 1990, the OTS announced in Thrift Bulletin 38-2 that FIRREA had eliminated "previously granted capital and accounting forbearances." Any thrift that failed to meet capital requirements as a result was required to submit a capital plan. Monycor submitted its capital plan to the OTS in March of 1990 (supplemented in April and May), indicating that it would achieve capital compliance. The OTS disapproved the plan on June 28, 1990, because it believed Monycor should have more than the minimum amount of capital, and it planned to implement an Individual Minimum Capital Requirement for the thrift (although the individual requirement was never approved by the OTS in Washington, D.C.). In June of 1990, the Investors contributed to Monycor an additional $600,000 in an attempt to replenish its regulatory capital. Id. at 313. Even so, on July 12, 1991, the OTS declared Monycor to have "substantially insufficient capital." It therefore seized the institution and appointed the RTC as receiver.
 
 III.
 
 14
 The Investors and Barron Bancshares filed suit in the Court of Federal Claims on August 28, 1990. In their action, they alleged that the United States had breached its contract with Barron by failing to honor the Forbearance Letter and thereby placing Monycor in receivership. They asserted that they were entitled to damages in the amount of $5.35 million, representing the value of their investment in Monycor. Id.
 
 
 15
 Like all cases similarly situated, Barron's suit was stayed pending the decision of the Supreme Court in Winstar IV. In Winstar IV, the Court affirmed the decision of this court in Winstar III that "the United States is liable to respondents [three thrifts] for breach of contract." 518 U.S. at 910, 116 S.Ct. 2432. The contracts in Winstar IV permitted the three failed thrifts in the case to meet regulatory capital requirements by using supervisory goodwill and to amortize "this `asset' ... over a substantial number of years." FDIC v. United States, 342 F.3d 1313, 1315 (Fed.Cir.2003) (quoting Landmark, 256 F.3d at 1370).
 
 
 16
 The FDIC intervened in this action in March of 1997, after Winstar IV was decided, and filed a complaint on behalf of Monycor, the seized thrift. In its complaint, the FDIC alleged that the provisions of FIRREA and the OTS capital regulations constituted, inter alia, a breach of Monycor's contract rights. The FDIC sought to recover damages as established at trial, compensation for all monies expended and costs incurred, and the value of all benefits conferred on the government.
 
 
 17
 On February 19, 1999, the FDIC moved for partial summary judgment as to liability. Thereafter, in September, the government moved to dismiss portions of both Barron's and the FDIC's complaints and for partial summary judgment. In due course, Barron renewed its previously filed motion for partial summary judgment as to liability, while the government filed a supplemental motion to dismiss the claims of the FDIC.[3] Barron Bancshares, 53 Fed.Cl. at 311.
 
 
 18
 On August 23, 2002, the Court of Federal Claims granted partial summary judgment in favor of the United States and dismissed portions of both complaints. The court ruled that the capital credit provision in the Assistance Agreement had the effect that, for regulatory purposes, cash paid to Monycor by the FSLIC would be taken into account as a cash component of net worth rather than being treated as an offsetting deduction to supervisory goodwill; it was not a contractual undertaking binding upon the United States, but only a statement of then-applicable regulatory policy. Id. at 319. The court made a similar ruling with respect to the supervisory goodwill provision contained in Bank Board Resolution No. 86-1215 that was incorporated into the Assistance Agreement. That provision allowed Monycor to amortize supervisory goodwill under the straight-line accounting method over a twenty-five-year period. Id. The court determined that the FSLIC's assistance payments and the Forbearance Letter's five-year supervisory forbearance "constituted the limit of the government's contractual undertaking." Id. at 318.
 
 
 19
 The Court of Federal Claims concluded that the United States had committed a breach of contract by failing to honor the five-year forbearance promised in the Forbearance Letter. Id. at 321-23. It determined, however, that Monycor's failure to meet its capital requirements, and not the government's breach, had caused the seizure of the thrift. Id. at 323-25; see also Barron Bancshares, Inc. v. United States, No. 90-830 C (Fed.Cl. Nov.8, 2002) ("Order Denying Reconsideration"). In reaching its conclusion, the court relied upon reports by the FDIC that Monycor was experiencing "a myriad of problems unrelated to losses on pre-acquisition assets." Barron Bancshares, 53 Fed.Cl. at 324 (quoting an FDIC Report of Examination (Mar. 8, 1991)). Thus, according to the court, the evidence suggested that the problems at Monycor were "of investor plaintiffs' own making." Id. at 325. Consequently, the court granted the government's motion for partial summary judgment and to dismiss portions of Barron's and the FDIC's complaints. Id. at 326. Thereafter, the court entered judgment in accordance with Court of Federal Claims Rule 54(b).[4] Id. at 326. This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).
 
 ANALYSIS
 I.
 
 20
 Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. Cl. R. 56(c); Castle, 301 F.3d at 1336. In the setting of a motion for summary judgment, all justifiable factual inferences are drawn in favor of the nonmovant. Southfork Sys., Inc. v. United States, 141 F.3d 1124, 1131 (Fed.Cir.1998); Winstar III, 64 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). We review a grant of summary judgment by the Court of Federal Claims de novo to determine whether the summary judgment standard has been correctly applied. Castle, 301 F.3d at 1337. Whether a contract exists is a mixed question of law and fact. Cienega Gardens v. United States, 194 F.3d 1231, 1239 (Fed.Cir.1998). Contract interpretation is a question of law that we review de novo. Id. (citing Winstar III, 64 F.3d at 1540). We generally review de novo the trial court's legal conclusions. See, e.g., Am. Fed'n of Gov't Employees v. United States, 258 F.3d 1294, 1298 (Fed.Cir.2001). Before turning to the main issue in this case, we address two preliminary matters.
 
 II.
 
 21
 The first question is whether the FDIC's claim is barred by the statute of limitations. Pursuant to 28 U.S.C. § 2501, any claim over which the Court of Federal Claims has jurisdiction is barred unless a complaint with respect to the claim is filed in the court "within six years after such claim first accrues." The FDIC moved to intervene in this case on March 27, 1997. This was more than six years after (i) the August 9, 1989 passage of FIRREA, (ii) the December 9, 1989 issuance of FIRREA's implementing regulations, and (iii) the August 28, 1990 filing of Barron's suit. The government moved to dismiss the FDIC's suit on the ground that it was untimely.
 
 
 22
 In an Order dated June 25, 2001, the Court of Federal Claims denied the government's motion. Barron Bancshares, Inc. v. United States, No. 90-830 C (Fed.Cl. June 25, 2001) ("Order Denying Dismissal of FDIC's Claims"). The court stated that "[u]nder even the most generous calculation of the claims' accrual date ... the FDIC's complaint, without more, is out of time." Id., slip op. at 2 (citing Ariadne Fin. Servs. v. United States, 133 F.3d 874 (Fed.Cir.1998)). The court nevertheless allowed the FDIC's action to proceed based upon its Rule 15(c). That rule, titled "Relation Back of Amendments," provides that "[a]n amendment of a pleading relates back to the date of the original pleading when the claim ... arose out of the conduct, transaction, or occurrence set forth ... in the original pleading...." Fed. Cl. R. 15(c). The Court of Federal Claims pointed out that Barron's first amended complaint, filed on July 30, 1992, set forth "all the operative facts from which the FDIC's later-asserted claims arise, including the underlying contract documents, the reliance on government-conferred forbearances, the passage of FIRREA, and FIRREA's subsequent impact on the bank." Order Denying Dismissal of FDIC's Claims, slip op. at 3. The court also pointed out that a notice of related case had been filed on August 28, 1990, identifying the suit as a Winstar-related case, and that the FDIC — through its predecessor, the RTC — had actively participated in the suit as early as 1991. Id. Finally, the court noted, "the FDIC acts here as receiver for the failed thrift, a role coincident with Plaintiffs' pursuit of the failed thrift's claims." Id. In the court's view, these facts, taken as a whole, placed the case within the purview of Snoqualmie Tribe v. United States, 178 Ct.Cl. 570, 372 F.2d 951 (1967).
 
 
 23
 In Snoqualmie Tribe, the Court of Claims addressed the application of Rule 13(c) of the former Indian Claims Commission, a rule identical to Court of Federal Claims Rule 15(c). The court stated that "the inquiry in a determination of whether a claim should relate back will focus on the notice given by the general fact situation set forth in the original pleading." Id. at 960. The court went on to conclude that a later-filed claim, brought on behalf of the Skykomish Tribe of Indians that technically presented a new cause of action, was not barred by the statute of limitations because it involved the claim of a closely related party, for the Snoqualmie and Skykomish Tribes were culturally intertwined. Additionally, the court noted that the claim arose under the same treaty that the Snoqualmie Tribe had invoked as the basis for its cause of action. Id. at 961. The court ruled that, in view of this virtual identity of tribal interests, the claim of the Skykomish Tribe was "sufficiently closely related to warrant the conclusion that the government received adequate notice of the possibility that it might have to defend against a broader claim." Id. In this case, the Court of Federal Claims reasoned that, as in Snoqualmie Tribe, it was "faced with later-added claims that arise out of the same transaction presented in plaintiffs' suit and that present the interests of a related party whose subsequent appearance here as a litigant the government clearly could have anticipated on the basis of the facts that plaintiffs initially had put into issue." Order Denying Dismissal of FDIC's Claims, slip op. at 3-4.
 
 
 24
 The Court of Federal Claims' ruling on the statute of limitations issue presents us with a denial of the government's motion to dismiss, a matter of law we review de novo because the facts themselves are not in dispute. See Banks v. United States, 314 F.3d 1304, 1307-08 (Fed.Cir.2003). We see no error in the Court of Federal Claims' treatment of the statute of limitations issue and have nothing to add to it. We agree with the court that the FDIC's complaint sufficiently relates back to Barron's original complaint to overcome the government's challenge based upon the six-year statute of limitations.[5]
 
 III.
 
 25
 The second preliminary matter we must address is the government's contention that the FDIC does not possess a claim thatit can assert against the United States. The gist of the argument is that the FDIC cannot maintain the claims it is asserting on behalf of Monycor, the failed thrift, because the RTC, as receiver for Monycor, sold all of Monycor's legal claims to the RTC in its corporate capacity ("RTC-Corporate"), an instrumentality of the United States. This sale, the government asserts, had the effect of extinguishing the claims at issue in this case. The reasoning is that because the FDIC, in its corporate capacity as successor to the RTC, is an instrumentality of the United States, the FDIC is actually bringing claims owned by the government against the government, thus presenting a classic nonjusticiable intragovernmental dispute. See, e.g., Anderson, 344 F.3d at 1349 (finding on the facts that "the FDIC's presence in this matter represents no more than an intergovernmental [sic] dispute which does not rise to the requisite level of a constitutional case or controversy"). Hence, according to the government, the claim must be deemed extinguished.
 
 
 26
 The pertinent facts are these: In March of 1992, the RTC was appointed receiver for Monycor. On the day it was appointed receiver, it transferred various Monycor assets, including the claims of the FDIC at issue in this case, to RTC-Corporate. In exchange for those assets, RTC-Corporate agreed to pay the net proceeds of any recovery on the assets to the Monycor receivership estate.[6]
 
 
 27
 The RTC ceased to exist on December 31, 1995. See Admiral, 329 F.3d at 1374. Pursuant to 12 U.S.C. § 1441a(m)(2), upon the sunset of the RTC, "all assets and liabilities of the Corporation [RTC]" were transferred to the FSLIC Resolution Fund ("FRF").[7] This meant that when the RTC ceased to exist, all its assets and liabilities were transferred to the FDIC in its capacity as manager of the FRF.[8] Id. at 1374-75. The FDIC thus became the owner of the Monycor claims that are at issue in this case. It also became the owner of the assets of the FSLIC that the RTC had taken over and became subject to the obligations of the FSLIC that the RTC had assumed.[9] As manager of FRF-RTC, the FDIC is subject to the provisions of 12 U.S.C. § 1823(d)(3), which provides in part as follows:
 
 
 28
 (A) In General. With respect to any asset acquired or liability assumed pursuant to this section, the Corporation [FDIC] shall have all of the rights, powers, privileges, and authorities of the [FDIC] as receiver....
 
 
 29
 (C) Fiduciary responsibility. In exercising any right, power, privilege, or authority described in subparagraph (A), the [FDIC] shall continue to be subject to the fiduciary duties and obligations of the [FDIC] as receiver to claimants against the insured depository institution in receivership.
 
 
 30
 (pursuant to 12 U.S.C. § 1811(a), "Corporation" refers to the FDIC).
 
 
 31
 We agree with the FDIC that, as manager of FRF-RTC and as successor-in-interest to the RTC, it is required to remit any net recovery that it may obtain on Monycor's claims to the receiver for distribution to Monycor's creditors. In other words, the FDIC is pursuing Monycor's claims for the benefit of the receivership and the receivership's creditors. Under these circumstances, the FDIC possesses a claim that it can pursue against the United States.
 
 
 32
 The government argues that the FDIC cannot rely upon 12 U.S.C. § 1823(d)(3)(C) as requiring it to assert the claims set forth in its complaint. The government notes that section 1823(d)(3)(C), by its terms, applies to assets acquired by the FDIC under section 1823 ("[w]ith respect to any asset required or liability assumed pursuant to this section"). See 12 U.S.C. § 1823(d)(1), (3)(A), (3)(C). The government points out that the FDIC did not acquire Monycor's assets pursuant to 12 U.S.C. § 1823(d)(1) ("Any ... receiver... appointed for any insured depository institution in default, including the [FDIC] acting in such capacity, shall be entitled to offer the assets of such depository institutions for sale to the Corporation...."). Rather, as seen above, the FDIC acquired Monycor's assets in its capacity as manager of FRF-RTC when the RTC was extinguished. We are not persuaded by the government's argument. Pursuant to 12 U.S.C. § 1441a(b)(4)(A), the RTC was given the same powers that the FDIC now has under 12 U.S.C. § 1823. This would have included, of course, the right to pursue claims on behalf of Monycor pursuant to section 1823(d). In Glass v. United States, 44 Fed.Cl. 73 (1999), rev'd-in-part on other grounds, 258 F.3d 1349 (Fed.Cir.2001), the Court of Federal Claims ruled that the statutory language "all assets and liabilities of the [FDIC] shall be transferred to the FSLIC Resolution Fund" meant that among the assets transferred was the right to maintain a lawsuit on behalf of a failed thrift for breach of contract arising from FIRREA and its implementing regulations. The court stated,
 
 
 33
 The government's interpretation — that the statute did not also transfer the status of receiver to the FRF — would mean, as the FDIC points out, that Congress chose deliberately to give FRF-RTC in all cases fewer rights to collect on its assets than RTC had during its existence. Even were the statutory succession not clear, such an interpretation of the statute would be illogical.
 
 
 34
 Glass, 44 Fed.Cl. at 80 (internal quotation marks omitted) (emphasis in original). We agree with the reasoning of the Court of Federal Claims on this point. We turn now to the main issue on appeal.
 
 IV.
 
 35
 As noted above, the Court of Federal Claims ruled on summary judgment that the capital credit and supervisory goodwill provisions in the contract documents did not constitute contractual obligations. Rather, they simply were statements of then-applicable regulatory policy. The court also ruled that while the government did breach its contractual five-year forbearance obligation, the thrift's failure to meet its capital requirements, and not this breach, resulted in the seizure of Monycor. Barron Bancshares, 53 Fed.Cl. at 319, 323-25; Order Denying Reconsideration. Plaintiffs challenge the court's rulings on both of these issues, which we address in turn.
 
 A. Capital Credits and Supervisory Goodwill
 
 36
 (i)
 
 
 37
 The Assistance Agreement specified that the cash paid to Monycor by the FSLIC "shall be credited to [Monycor's] net worth account." Assistance Agreement § 6(a)(1)(iii). This meant that, for capital compliance purposes, the FSLIC's contributions were to be viewed as constituting a cash component of net worth rather than as an offsetting deduction to supervisory goodwill. See Barron Bancshares, 53 Fed.Cl. at 313. Supervisory goodwill was to be amortized by the straight-line method over a period of up to twenty-five years, with unamortized supervisory goodwill permitted to be counted towards regulatory capital requirements. Bank Board Resolution No. 86-1215, at 6. Although the Court of Federal Claims recognized that these same provisions were part of the Winstar contracts, it nevertheless determined that the case before it was "non-Winstar" in character. Barron Bancshares, 53 Fed.Cl. at 318. According to the court, the assistance payments by the FSLIC, rather than particular capital credit and supervisory goodwill treatment, were the true focus of the parties' agreements and interactions. Id. at 318-19. The court concluded that the government intended to be contractually bound only with respect to assistance payments and the five-year forbearance, but it found lacking a mutual intent to contract with regard to treatment of goodwill and capital credits. Id. at 317-18.
 
 
 38
 In reaching its conclusion, the Court of Federal Claims pointed out that, in contrast to the Winstar transactions, the Investors made no mention of purchase accounting, capital credits, or goodwill in their bid to acquire Barron County, but requested only the five-year supervisory forbearance. Id. The court noted that the supervisory goodwill and capital credit provisions of the contract (as reflected in Bank Board Resolution No. 86-1215) were not the subject of precontract negotiations. Id. The court further noted that Monycor's failure either to record a capital credit or to maximize its supervisory goodwill over the permitted twenty-five-year period confirmed to the court that those accounting treatments were not part of the parties' shared understanding of the government's contractual obligations. Id. at 318. The Court of Federal Claims also pointed out that the Investors raised no objection, either in their post-FIRREA responses to regulators or in their original or amended complaints filed in the court, to FIRREA's abrogation of the supervisory goodwill and capital credit provisions of the contract. Id. It was only after the FDIC's intervention in 1997 that the Investors raised these issues. Id. The court therefore concluded that the Investors understood these provisions to be nothing more than statements of accounting principles applicable to the thrift at the time of the contract. Id. at 319.
 
 
 39
 Plaintiffs contend that the decision of the Court of Federal Claims is directly contrary to the Supreme Court's precedent in Winstar IV because, as the Court of Federal Claims recognized, the language in the Monycor contract is virtually identical to the language in the three contracts at issue in Winstar. Id. at 317. Relying on Winstar IV, Plaintiffs argue that the court should have ruled that the supervisory goodwill and capital credit provisions in this case were contractual obligations binding upon the United States.
 
 
 40
 Plaintiffs point out first that the assistance agreements in all three Winstar contracts contained an Accounting Principles section virtually identical to the one in this case. Second, Plaintiffs note that the supervisory goodwill and capital credit provisions in the Monycor Bank Board Resolutions are indistinguishable from the same provisions in the Bank Board resolutions relating to Statesman Savings Holding Corp. ("Statesman Bank"), one of the failed thrifts in Winstar. Third, all three Winstar contracts also included an integration clause, to use the Court of Federal Claims' phrase, "essentially identical" to the one in the Monycor Assistance Agreement. Accordingly, Plaintiffs contend, the Supreme Court's decision in Winstar IV is controlling for this case: the supervisory goodwill and capital credit provisions in the Monycor contract constituted contractual obligations to which the United States was bound.
 
 
 41
 Finally, it is asserted that without supervisory goodwill or capital credit, Monycor, like the three Winstar thrifts, would have been insolvent immediately upon completion of the acquisition. Plaintiffs note that Monycor's audited financial statement demonstrates that as of the date of Barron County's acquisition and transformation into Monycor, the thrift recorded $5.9 million in intangible assets on its books, including $4.9 million in supervisory goodwill. At the same time, Monycor's total Stockholders' Equity was only $4.25 million. Without the ability to count the $4.9 million in supervisory goodwill (or without the capital credit), Monycor would have been insolvent by $650,000 at the close of the transaction. Plaintiffs point out that the Supreme Court found like circumstances compelling evidence of contractual intent. See Winstar IV, 518 U.S. at 863, 116 S.Ct. 2432 (stating that if supervisory goodwill had not been available for meeting regulatory capital requirements, the merged thrift would have been subject to regulatory noncompliance and penalties from the moment of its creation and that "it would have been irrational... for Glendale to stake its very existence upon continuation of current policies without seeking to embody those policies in some sort of contractual commitment").
 
 
 42
 Plaintiffs assert that rather than considering extrinsic evidence to discern the intent of the parties, the Court of Federal Claims first should have examined the contract language to determine its plain meaning. Because the supervisory goodwill and capital credit provisions in the Monycor documents are clear and unambiguous, Plaintiffs argue, the court erred when it considered extrinsic evidence of the precontract bid and the parties' postcontract dealings to determine the parties' intent. Pointing to the integration clause in the Assistance Agreement, Plaintiffs invoke the parol evidence rule to characterize as inadmissible any evidence introduced to modify, supplement, or interpret the terms of the contract.
 
 
 43
 The government responds by pointing to what it contends are considerations that distinguish the Monycor contract from the Statesman Bank contract in Winstar IV. First, the government notes, the forbearance letter in the Statesman Bank transaction explicitly recognized a capital credit, while the forbearance letter in the Monycor contract mentioned neither supervisory goodwill nor a capital credit. Likewise, the Bank Board resolutions in the Statesman Bank transaction explicitly acknowledged the capital credit and supervisory goodwill provisions, while in this case, Resolution No. 86-1215 only used the word "contracted" in reference to assistance payments. The government also points out that the capital maintenance agreement in the Statesman Bank transaction explained that "any determination of ... Required Regulatory Capital ... shall include ... amounts permitted by the FSLIC in the Assistance Agreement and in the forbearances issued in connection with the transactions discussed herein." In this case, by contrast, the capital maintenance agreement contained no such explanation. In fact, the government notes, the contract documents in this case state on four separate occasions — in section 14(e) and (f) of the Assistance Agreement and in the similarly worded Net Worth Maintenance Stipulation executed by Barron Bancshares and Personal Net Worth Maintenance Stipulation executed by Investors[10] — that future capital requirements may change, and that, if they do, Monycor is required to meet the greater requirement.
 
 
 44
 Second, the government directs our attention to evidence of the facts and circumstances surrounding the Monycor transaction. As the Court of Federal Claims found persuasive, the Investors did not include supervisory goodwill and capital credit provisions in their bid, in memoranda summarizing their negotiations, or in their discussions or inquiries. Moreover, they decided not to record any goodwill on Monycor's books immediately after the acquisition. Rather, they chose to amortize the supervisory goodwill over fifteen years rather than twenty-five, and they chose not to record a capital credit. In fact, the Investors even recognized in their own board minutes that Monycor bore the risk of changes in capital regulations.
 
 
 45
 Finally, the government disputes Plaintiffs' assertion that without the supervisory goodwill and capital credit provisions, Monycor would have been insolvent at the time the transaction closed. The government contends that Barron Bancshares and the Investors admitted that they had the ability and resources to meet the new capital requirements, and furthermore that doing so would have entailed no costs. Thus, in contrast to the situation before the Supreme Court in Winstar IV, it was not "irrational" for the Investors to enter into the Monycor transaction without contractual commitments with respect to supervisory goodwill and capital credits.
 
 (ii)
 
 46
 We agree with Plaintiffs that the United States was contractually obligated with respect to the regulatory treatment of (i) the FSLIC's contributions to Monycor and (ii) Monycor's supervisory goodwill. In the Court of Federal Claims, it was not disputed that a contract existed between Barron and the United States. Barron Bancshares, 53 Fed.Cl. at 315. Neither was it disputed that the integration clause in the Assistance Agreement, which expressly incorporated the Bank Board Resolutions and the Forbearance Letter, was effective.[11] Id. at 319 ("The goodwill and capital credit provisions, though incorporated into the contract by the integration clause...."). We have stated that an integration clause "conclusively establishes that the integration is total unless (a) the document is obviously incomplete or (b) the merger clause was included as a result of fraud or mistake or any other reason to set aside the contract." Rumsfeld v. Freedom N.Y., Inc., 329 F.3d 1320, 1329 (Fed.Cir.2003) (quoting John D. Calamari & Joseph M. Perillo, The Law of Contracts § 3.2(a) (4th ed.1998)). The government has asserted neither incompleteness of the Assistance Agreement nor fraud nor mistake in the inclusion of the integration clause. We therefore hold that the Assistance Agreement fully integrates both the Bank Board Resolutions and the Forbearance Letter into an executed contract. As a result, the United States was contractually obligated in accordance with the terms of the Resolutions and the Forbearance Letter.
 
 
 47
 It is in this regard that we part company with the Court of Federal Claims. Although the court recognized the effectiveness of the integration clause in the Assistance Agreement, it nevertheless evaluated extrinsic evidence in construing the terms of the contract. This we think was error. It is true, as the court explained, that mutual intent to contract is required to prove an enforceable agreement, and that there must be an offer, an acceptance, consideration, and governmental authority. See Cal. Fed., 245 F.3d at 1346. In this case, however, the court was not faced with the question of whether a contract existed; rather, the task before the court was to construe what was conceded to be a fully integrated agreement.
 
 
 48
 When construing a contract, a court first examines the plain meaning of its express terms. Textron Def. Sys. v. Widnall, 143 F.3d 1465, 1468 (Fed.Cir.1998). The parol evidence rule is a rule of substantive law that prohibits the use of external evidence to add to or otherwise modify the terms of a written agreement "in instances where the written agreement has been adopted by the parties as an expression of their final understanding." See, e.g., David Nassif Assocs. v. United States, 214 Ct.Cl. 407, 557 F.2d 249, 256 (1977). The rule thus renders inadmissible evidence introduced to modify, supplement, or interpret the terms of an integrated agreement. McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed.Cir.1996). Evidence of the parties' course of dealing constitutes this kind of parol evidence that is prohibited by the rule. Alves v. United States, 133 F.3d 1454, 1459 (Fed.Cir.1998). If the terms of a contract are clear and unambiguous, they must be given their plain meaning — extrinsic evidence is inadmissible to interpret them. McAbee Constr., 97 F.3d at 1435. A contract provision is only ambiguous if susceptible to more than one reasonable meaning. Edward R. Marden Corp. v. United States, 803 F.2d 701, 705 (Fed.Cir.1986). In this case, because the supervisory goodwill and capital credit provisions of the contract are clear and unambiguous, we must construe them according to their plain meaning, without resort to parol evidence. In so doing, based upon the language of the transaction documents, we find the provisions to be contractually binding upon the government.
 
 
 49
 Our conclusion is consistent with the precedent of Winstar. In Winstar III, this court, en banc, held that the three plaintiff thrifts, Glendale Federal Bank ("Glendale"), Statesman Savings Holding Corporation, the Statesman Group Incorporated, and American Life and Casualty Company (also "Statesman Bank"), and Winstar Corporation ("Winstar"), "negotiated contracts with the bank regulatory agencies that allowed them to include supervisory goodwill (and capital credits) as assets for regulatory capital purposes and to amortize that supervisory goodwill over extended periods of time." 64 F.3d at 1545. The court's holding as to the contracts that were formed was based upon its examination of the pertinent contract documents. In the case of Glendale, the contract documents were a supervisory action agreement, Bank Board Resolution No. 81-710, and an opinion letter from Glendale's independent accountants. Id. at 1540-41. In the case of Statesman Bank, the documents were an assistance agreement, Bank Board Resolution No. 88-169, and an opinion from Statesman Bank's independent accountants. Id. at 1542-43. Finally, in the case of Winstar, the documents were an assistance agreement, a forbearance letter, Bank Board Resolution No. 84-363, and an opinion letter from Winstar's independent accountants. Id. at 1543-44. In Winstar IV, the Supreme Court affirmed the Federal Circuit's holding with respect to the contracts that were formed between Glendale, Statesman Bank, and Winstar, respectively, and the United States. See 518 U.S. at 864, 116 S.Ct. 2432 (Glendale), at 865-66, 116 S.Ct. 2432 (Winstar), at 867, 116 S.Ct. 2432 (Statesman Bank). The language of the Monycor documents is virtually identical to the language of the documents in the three Winstar transactions.
 
 
 50
 Bank Board Resolution No. 86-1215 addressed supervisory goodwill and capital credit provisions, providing that GAAP was to be used except
 
 
 51
 as it may be modified by the following procedures, which shall be employed:
 
 
 52
 (a) Push-down accounting shall be used to reflect the Acquisition on the books of [Monycor];
 
 
 53
 (b) The cash contributions by the FSLIC to [Monycor], pursuant to the Assistance Agreement, may be deemed a contribution to net worth and may be booked as a direct credit to [Monycor's] net worth;
 
 
 54
 (c) The value of any intangible assets resulting from the Acquisition shall be amortized by [Monycor] over a period not to exceed 25 years by the straight line method....
 
 
 55
 The capital credit was also addressed in section 6(a)(1)(iii) of the Assistance Agreement, titled in part Contributions by the [FSLIC]: "all cash contributions made under this § 6(a)(1) shall be credited to [Monycor's] net worth account." Thus, pursuant to the Bank Board Resolution, Monycor was allowed to treat the cash contributions by the FSLIC as contributions to net worth and to book them as direct capital credits. Monycor also was allowed to amortize the value of any intangible assets resulting from the acquisition, including supervisory goodwill, over a period of up to twenty-five years by the straight-line method.
 
 
 56
 The goodwill and capital credit provisions in the Statesman Bank transaction in Winstar III were virtually identical to those before us. Thus, Bank Board Resolution No. 88-169 approving the Statesman Bank transaction provided for the use of GAAP
 
 
 57
 except to the extent of the following departures from generally accepted accounting principles:
 
 
 58
 (a) Twenty-one million dollars of the initial contribution by the [FSLIC] to [Statesman Bank], and five million dollars of the principal amount of the Subordinated Debenture issued to the FSLIC, pursuant to § 6 of the Assistance Agreement, shall be credited to the regulatory capital account of [Statesman Bank]; and
 
 
 59
 (b) The value of any unidentifiable intangible assets resulting from accounting for the Acquisition and the Mergers in accordance with the purchase method of accounting may be amortized by [Statesman Bank] over a period not in excess of twenty-five (25) years by the straight line method....
 
 
 60
 Winstar III, 64 F.3d at 1543. At the same time, as in the Monycor transaction, the Assistance Agreement in the Statesman Bank transaction set forth the capital credit provision: "$26 million of the contribution [made by the FSLIC] shall be credited to [Statesman Bank's] regulatory capital account and shall constitute regulatory capital...." Winstar IV, 518 U.S. at 866, 116 S.Ct. 2432.
 
 
 61
 Section 19 of Monycor's Assistance Agreement set forth the applicable accounting principles, stating,
 
 
 62
 except ... where such principles [GAAP] conflict with the terms of the Agreement, applicable regulations of the Bank Board or [FSLIC], or any resolution or action of the Bank Board approving or relating to the Acquisitions or to this Agreement; then this Agreement, such regulations, or such resolution or action shall govern.... If there is a conflict between such regulations and the Bank Board's resolution or action relating to the Acquisitions or to this Agreement, the Bank Board's resolution or action shall govern. For purposes of this section, the accounting principles and governing regulations shall be those in effect on the Effective Date, as subsequently clarified or interpreted by the Bank Board....
 
 
 63
 Thus, the principles set forth in the Bank Board Resolution trump the regulations should a conflict arise.
 
 
 64
 The Assistance Agreements in both the Winstar and Statesman Bank transactions contained virtually identical language:
 
 
 65
 except ... where such principles [GAAP] conflict with the terms of this Agreement, applicable regulations of the Bank Board or the [FSLIC], or any resolution or action of the Bank Board approving or adopted concurrently with this Agreement, then this Agreement, such regulations, or such resolution or action shall govern.... If there is a conflict between such regulations and the Bank Board's resolution or action, the Bank Board's resolution or action shall govern. For purposes of this section, the governing regulations and the accounting principles shall be those in effect on the Effective Date or as subsequently clarified by the Bank Board....
 
 
 66
 Winstar IV, 518 U.S. at 865, 116 S.Ct. 2432 (Winstar transaction), at 866, 116 S.Ct. 2432 ("The Assistance Agreement between Statesman [Bank] and [the] FSLIC included an `accounting principles' clause virtually identical to Winstar's....").
 
 
 67
 We are not persuaded by the government's arguments regarding the differences between the contract documents in this case and those in the Statesman Bank transaction. The Monycor Assistance Agreement fully integrated the three Bank Board Resolutions and the Forbearance Letter into the executed, binding contract. Because the supervisory goodwill and capital credit provisions were explicit in Resolution No. 86-1215, and the capital credit was recited again in the Assistance Agreement, they both were terms of the contract. It is thus immaterial that the forbearance letter in the Statesman Bank transaction explicitly recognized a capital credit, while the forbearance letter in this case did not. Neither is it instructive that the capital maintenance agreement in the Statesman Bank transaction expressly included in the determination of Statesman Bank's required capital any amounts permitted by the FSLIC in the Assistance Agreement and any forbearances issued in connection with the transaction, while the capital maintenance agreement in this case did not. It is enough that the provisions were unambiguously set forth in documents that were integrated into the entire agreement between the parties.
 
 
 68
 Finally, as in Winstar III and Winstar IV, we are persuaded by evidence to the effect that the recapitalized thrift would have been out of compliance with regulatory capital standards from its inception were it unable to include supervisory goodwill in the relevant calculations. See, e.g., Winstar III, 64 F.3d at 1542 (Glendale transaction) ("It is not disputed that if supervisory goodwill had not been available for purposes of meeting regulatory capital requirements, the merged thrift would have been subject to regulatory noncompliance and penalties from the moment of its creation."); id. at 1542 n. 5 ("Glendale asserts, and the government does not disagree, that after merging ... Glendale's net worth would have been negative $460 million if supervisory goodwill had not been counted as a capital asset."); Winstar IV, 518 U.S. at 863, 116 S.Ct. 2432 (stating that it would have been "irrational" for Glendale to enter into a transaction that would have rendered it immediately insolvent by approximately $460 million were it unable to count goodwill as regulatory capital).[12] In this case, had Monycor not been afforded the benefit of the capital credit or supervisory goodwill provisions, it would have been insolvent by $650,000 at the moment the transaction closed. Barron Bancshares, 53 Fed.Cl. at 312 (explaining that Monycor had $4.908 million in unallocated goodwill and sold $4.25 million in capital stock). This is additional convincing evidence that the parties intended for the supervisory goodwill and capital credit provisions to be contractual obligations, not merely statements of then-applicable regulatory accounting principles.
 
 
 69
 (iii)
 
 
 70
 The Court of Federal Claims ruled, however, that the goodwill and capital credit provisions of the Monycor contract were not contractual obligations binding upon the United States. The court stated,
 
 
 71
 In the absence, then, of any indication that investor plaintiffs requested a capital credit and amortizable goodwill, that the parties negotiated for those accounting treatments, that the government evidenced an intent to be contractually bound by those provisions or that plaintiffs acted in a manner consistent with possessing those contract rights, we cannot conclude that this case is governed by Winstar.
 
 
 72
 Barron Bancshares, 53 Fed.Cl. at 319 (footnote omitted). We are unable to agree with the Court of Federal Claims. We have already noted that the parol evidence rule renders inadmissible evidence introduced to modify, supplement, or alter the terms of an integrated agreement. Moreover, as discussed in Winstar III, we based our determination as to the terms of the Glendale, Statesman Bank, and Winstar contracts upon the contract documents themselves. Neither we nor the Supreme Court relied upon parol evidence in determining the nature of the contracts between the three thrifts and the United States.[13]
 
 
 73
 Significantly, the government has not directed us to a case in which contract provisions set forth in clear and unambiguous language and accompanied by an integration clause were disregarded by reason of the absence of parol evidence reflecting negotiations for those provisions. Indeed, we have consistently rejected such an approach. See Coast Fed. Bank v. United States, 323 F.3d 1035, 1038 (Fed.Cir.2003) ("Where, as here, the provisions of the Agreement are phrased in clear and unambiguous language, they must be given their plain and ordinary meaning, and we may not resort to extrinsic evidence to interpret them."); Freedom N.Y., 329 F.3d at 1327 ("[W]hen a document is integrated ... a party to a written contract cannot supplement or interpret that agreement with oral or parol statements that conflict with, supplant, or controvert the language of the written agreement itself." (quoting Schism v. United States, 316 F.3d 1259, 1278 (Fed.Cir.2002) (en banc))); Landmark, 256 F.3d at 1373 ("Because the Agreement's provisions are `clear and unambiguous, they must be given their plain and ordinary meaning.'" (quoting Alaska Lumber & Pulp Co. Inc. v. Madigan, 2 F.3d 389, 392 (Fed.Cir.1993))); McAbee Constr., 97 F.3d at 1434 (stating that the parol evidence rule "prohibits the use of extrinsic evidence to add to or modify" the terms of a fully integrated agreement, and that if the terms of the contract are clear and unambiguous, "they must be given their plain and ordinary meaning, and the court may not resort to extrinsic evidence to interpret them" (citations omitted)); City of Tacoma v. United States, 31 F.3d 1130, 1134 (Fed.Cir.1994) ("Outside evidence may not be brought in to create an ambiguity where the language is clear."); Beta Sys. v. United States, 838 F.2d 1179, 1183 (Fed.Cir.1988) ("[E]xtrinsic evidence will not be received to change the terms of a contract that is clear on its face.").[14] In short, the contract terms speak for themselves. Bound by the four corners of the contract, we hold that the supervisory goodwill and capital credit provisions of the Monycor transaction were contractual obligations binding on the United States.
 
 
 74
 (iv)
 
 
 75
 We must now consider the consequences of our holding that supervisory goodwill and capital credits were obligations of the United States under the contract. In Winstar III, we stated,
 
 
 76
 There can be little question that the application of FIRREA and the regulations thereunder to deny or restrict plaintiffs' contractual rights to use supervisory goodwill with the associated amortization periods, and for Statesman's capital credits, in partial satisfaction of their capital requirements was a breach of the FSLIC's and the Bank Board's agreements with them. FIRREA greatly reduced the amount of supervisory goodwill that could be used to meet regulatory capital requirements. See 12 U.S.C. § 1464(t). The OTS by regulation treated capital credits in the same manner as supervisory goodwill, see 12 C.F.R. § 567.1(w), thereby restricting the use of such credits for regulatory capital purposes.
 
 
 77
 64 F.3d at 1544-45 (footnote omitted). In Winstar IV, the Supreme Court stated, "We accept the Federal Circuit's conclusion that the Government breached [the Glendale, Statesman Bank, and Winstar] contracts when, pursuant to the new regulatory capital requirements imposed by FIRREA, 12 U.S.C. § 1464(t), the federal regulatory agencies limited the use of supervisory goodwill and capital credits in calculating respondents' net worth." 518 U.S. at 870. Winstar teaches that through FIRREA and its implementing regulations the United States breached its agreement, in contracts like the one at issue in this case, to afford specified regulatory treatment to supervisory goodwill and capital credits. This means that, in this case, FIRREA and its implementing regulations breached the government's agreement with respect to the accounting treatment to be accorded Monycor's supervisory goodwill and capital credits.
 
 
 78
 This case presents a wrinkle, however. In the Court of Federal Claims, the government argued that Plaintiffs were precluded from recovering damages based upon the doctrine of prior material breach. Barron Bancshares, 53 Fed.Cl. at 321. Under that doctrine, when a party to a contract is sued for breach, it may defend on the ground that there existed a legal excuse for its nonperformance at the time of the alleged breach. Coll. Point Boat Corp. v. United States, 267 U.S. 12, 15, 45 S.Ct. 199, 69 L.Ed. 490 (1925). Faced with two parties to a contract, each of whom claims breach by the other, courts will "often ... impose liability on the party that committed the first material breach." E. Allen Farnsworth, Farnsworth on Contracts § 8.15, at 439 (1990); see also Christopher Vill., L.P. v. United States, 360 F.3d 1319, 1334 (Fed.Cir.2004). According to the Restatement, the doctrine of prior material breach is
 
 
 79
 based on the principle that where performances are to be exchanged under an exchange of promises, each party is entitled to the assurance that he will not be called upon to perform his remaining duties ... if there has already been an uncured material failure of performance by the other party.
 
 
 80
 Restatement (Second) of Contracts § 237 cmt. b (1981); see also Christopher Vill., 360 F.3d at 1334. The government asserted in the Court of Federal Claims that the Investors committed a prior material breach of contract by failing to operate Monycor in the manner represented in the application they submitted for the thrift's acquisition. Barron Bancshares, 53 Fed.Cl. at 321.
 
 
 81
 In the alternative, the government urged that the Investors' failure to operate Monycor in the manner specified in their application constituted a material misrepresentation. Id. "If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient." Restatement (Second) of Contracts § 164; see also T. Brown Constructors v. Pena, 132 F.3d 724, 728-29 (Fed.Cir.1997) (citing Restatement (Second) of Contracts § 164 cmt. a (1979)); Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed.Cir.1992). In short, assuming the government was contractually obligated to afford Monycor particular accounting treatment for its supervisory goodwill and capital credits and assuming further that obligation was breached, a prior material breach or a material misrepresentation on the part of the Investors could excuse the government from its contractual obligations, rendering moot its breach in enacting FIRREA.
 
 
 82
 In making these arguments, the government asserted that Barron had failed to operate Monycor in the manner it had promised. The government pointed to Barron's bid to acquire Barron County and its business plan, which stated it was Barron's intention to pursue a "more conservative style of operation" and "the traditional lines of business for savings and loan associations," with emphasis on "local residential mortgage financing." Barron Bancshares, 53 Fed.Cl. at 321. Instead, the government claimed, Barron engaged in "a practice of reckless lending," marked by its decision to enter the construction loan business, to open an office on the premises of a lumber yard in Minnesota owned by one of the Investors, and to extend unsecured loans to the lumber yard's customers. Id. The government also argued that Barron did not run Monycor in accordance with its business plan, for rather than building net worth, the Investors extracted all of Monycor's income in its initial years of operation. Id. In addition, the government cited loans made to business associates of one of the Investors, which directly violated the first paragraph of the Stipulation Concerning Directors and Officers ("Stipulation").[15] The government also noted the decision to make the Investors the only members of Monycor's Board of Directors ("Board"), which violated the Stipulation's requirement in its second paragraph that no more than one third of the members of the Board be salaried officers or employees of Monycor. Id. Finally, the government contended that Barron breached section 13(f) of the Assistance Agreement by violating various statutes and regulations regarding lending practices. Id. at 322.[16]
 
 
 83
 The Court of Federal Claims rejected the government's claim of prior material breach or material misrepresentation for two reasons. First, the court concluded that neither a prior material breach nor a material misrepresentation had occurred. The court determined that Barron's decision "to expand the thrift's lending program into the Minnesota markets" did not "so violate the broad mission statement of emphasizing local real estate loans so as to constitute fraud or material misrepresentation." Id. The court pointed out that business plans must necessarily be flexible and responsive to changes in business climate and that a policy statement such as Monycor's is "simply too general to support a finding that the particular business decision sufficiently departed from the business strategy as to amount to fraud." Id. Furthermore, the court found lacking any evidence from the government that Barron's alleged violations were integral to the contract or anything other than regulatory violations for which the government had adequate remedies far less extreme than voiding the contract. Id. Had the regulatory violations been extreme, the court reasoned, the OTS would have seized Monycor immediately upon discovering them rather than giving repeated instructions on how to solve them. Id.
 
 
 84
 Second, the court determined that even if the government had proven a prior material breach, it had waived the claim. Id. at 323. The court noted that an injured party may either cancel a contract based on a breach, or it may instead continue the contract, in which case "the obligations of both parties remain in force...." Id. (quoting Cities Serv. Helex, Inc. v. United States, 211 Ct.Cl. 222, 543 F.2d 1306, 1313 (1976)). The court concluded that by continuing to make payments pursuant to the Assistance Agreement (which the court had found were "at the very heart of the contractual undertaking") until its obligations were completed in December of 1991, the government chose to continue to perform under the contract. Id. The court further relied upon the fact that the government did not allege that Barron had breached the contract until after commencement of the litigation. Id. The court ruled that the government "continued performance under the contract despite perceived material breaches," thereby failing to reserve any claim of prior breach. Id. (quoting Coast-to-Coast Fin. Corp. v. United States, 52 Fed.Cl. 352, 363 (2002)).
 
 
 85
 On appeal, the government denies that it waived its claim for a prior material breach. In fact, rather than continuing to perform in the face of a breach, the government argues, it actually terminated the contract because of Barron's breaches by seizing Monycor after it failed to cure its deficiencies. In addition, the government contends that any waiver that bars its claim for prior material breach would also bar Barron's claims to enforce the supervisory goodwill and capital credit provisions of the contract based on Barron's failure to assert them until long after the passage of FIRREA, the seizure of Monycor, and the commencement of the litigation. In response, Barron distinguishes its contractual rights to capital credit and supervisory goodwill treatment from the procedural right of the government to treat the contract as terminated upon establishing a breach by Barron. By continuing performance despite claiming that Barron had breached the contract, the government waived its right to terminate or cancel the contract, but Barron by contrast waived none of its contractual rights to supervisory goodwill and a capital credit, which could only be waived by a written modification of the contract. Thus, Plaintiffs urge us to affirm the holding of the court that the government waived its defense of prior material breach or material misrepresentation.
 
 
 86
 We review de novo the Court of Federal Claims' decision to deny the government's motion for summary judgment based on a prior material breach or material misrepresentation. See, e.g., Castle, 301 F.3d at 1337. We agree with the court that through its continued performance of the contract, the government waived any claim for prior material breach or material misrepresentation giving rise to the right to terminate the contract. We therefore do not reach the merits of the prior material breach or material misrepresentation issue.
 
 
 87
 We are persuaded by the fact that the government continued its assistance payments to Monycor until it completed its obligation to do so in December of 1991. Under these circumstances, it cannot be disputed that by doing so, the government was performing under the contract. See Cities Serv. Helex, 543 F.2d at 1313-17 (finding that the plaintiffs had elected to continue the contract because of their failure to take any action to end it, their continued performance, their insistence on continued government performance, and their acceptance of that performance); Coast-to-Coast, 52 Fed.Cl. at 363 ("These actions indicate that the government continued performance under the contract despite perceived material breaches.... The government did not reserve any claim of prior breach....").
 
 
 88
 On the one hand, the government claims that "investor plaintiffs almost immediately implemented a practice of reckless lending," Barron Bancshares, 53 Fed.Cl. at 321; yet on the other, it nevertheless continued to make its assistance payments for the full five years. In order to preserve its claim of a prior material breach giving rise to the right to terminate the contract, the government had to treat Barron as if it had breached the contract. See 14 Williston on Contracts § 43:15 (4th ed.2000) (explaining that faced with a material breach by the other party to a contract, one has the choice "to continue to perform under the contract or to cease to perform, and conduct indicating an intention to continue the contract ... in effect waiv[es] the right to assert that the breach discharged any obligation to perform"); Cities Serv. Helex, 543 F.2d at 1313-14 (discussing four approaches to the question of whether a party's conduct precludes it from asserting prior material breach as a defense); First Heights Bank, FSB v. United States, 51 Fed.Cl. 659, 663-64 (2001) (explaining the rule set forth in Cities Serv. Helex). It did not do that. We conclude that the government waived its right to treat Barron's actions as having terminated the contract.
 
 
 89
 In sum, we reverse the decision of the Court of Federal Claims that supervisory goodwill and capital credit treatment were not contractual obligations binding upon the United States. They were obligations of the government, and they were breached by FIRREA and its implementing regulations. At the same time, we affirm the decision of the court that by continuing to perform, the government waived any claim with respect to a prior material breach or material misrepresentation by Barron. The case is remanded to the Court of Federal Claims for a determination of the damages, if any, to which Plaintiffs are entitled by reason of the government's breach.
 
 
 90
 B. The Government's Breach of the Forbearance Letter
 
 
 91
 The Court of Federal Claims did find contractually binding the FSLIC's promise to forbear for a period of five years from holding Monycor accountable to regulatory minimum net worth requirements. Barron Bancshares, 53 Fed. Cl. at 321. The Investors had requested this forbearance in their bid; it had been discussed by the parties; and it was specifically enumerated in the Forbearance Letter. Id. The court thus ruled that the government's failure to honor this provision constituted a breach of contract. Id.
 
 
 92
 Ultimately, however, the Court of Federal Claims determined that the government could not be held liable for breach of the Forbearance Letter and the seizure of Monycor. The government had argued that prior material breach and material misrepresentation on the part of the Investors shielded it from liability for breach of the Forbearance Letter. See id. at 321-22. As just seen, the court rejected those arguments. Id. at 322-23. Nevertheless, the court held that it was not the government's breach of the five-year forbearance obligation, but Monycor's failure to meet its capital requirements, that caused the seizure of the thrift. Id. at 324-25. The court stated that the evidence was "insufficient to demonstrate that the thrift was seized as a result of a capital impairment attributable to the government's failure to honor the supervisory forbearance." Id. at 324. The court added: "All indications point to the conclusion that the problems at Monycor were of investor plaintiffs' own making." Id. at 325. Subsequently, in denying Plaintiffs' motion for reconsideration, the court stated,
 
 
 93
 The simple fact, however, is that the bank did not meet its capital requirements, but instead was out of capital compliance with respect to its risk-based requirement by approximately $3.1 million. And it was this capital inadequacy — and not the bank's poor management — that we identified as the cause of the bank's seizure.
 
 
 94
 Order Denying Reconsideration, slip op. at 2. The court therefore entered summary judgment in favor of the government on Plaintiffs' claim for damages arising from the government's breach of the Forbearance Letter.
 
 
 95
 On appeal, Barron contends that summary judgment was inappropriate on the issue of the cause of Monycor's seizure. Relying on other Winstar cases, it notes that the Court of Federal Claims has previously found it inappropriate to determine the cause of a thrift's seizure at the summary judgment stage. See, e.g., Hometown Fin., Inc. v. United States, 53 Fed.Cl. 326, 338 (2002); Westfed Holdings, Inc. v. United States, 52 Fed.Cl. 135, 159-60 (2002); Slattery v. United States, 35 Fed.Cl. 180, 186 (1996). Moreover, according to Barron, the trial court's ruling is unclear. The summary judgment opinion states that Barron's evidence was "insufficient to demonstrate that the thrift was seized as a result of a capital impairment attributable to the government's failure to honor the supervisory forbearance" but rather that "[a]ll indications point to the conclusion that the problems at Monycor were of investor plaintiffs' own making." Barron Bancshares, 53 Fed.Cl. at 324, 325. Yet, in its subsequent Order Denying Reconsideration, the court identified "capital inadequacy — and not the bank's poor management ... as the cause of the bank's seizure." Slip op. at 2.
 
 
 96
 The FDIC separately urges that evidence submitted before the Court of Federal Claims conflicts with the court's decision and that summary judgment was inappropriate. According to the FDIC, while the court relied upon critical examination reports issued long after Monycor had lost its goodwill and capital credit, i.e., a post-FIRREA, December 1990 financial report, Barron Bancshares, 53 Fed.Cl. at 325, Barron showed that prior to FIRREA, Monycor was satisfying all of its capital requirements. The FDIC notes that the Investors offered a letter dated December 6, 1990, from an OTS supervisory agent advising that if the government granted the five-year forbearance in the Forbearance Letter, Monycor would exceed the minimum capital requirements under FIRREA for the quarter ending September 30, 1990.
 
 
 97
 The government responds by relying on the arguments it asserted in the trial court with respect to alleged prior material breach or material misrepresentation. Thus, it contends that Barron failed to adhere to its business plan, the terms of the Stipulation, and section 13(f) of the Assistance Agreement.
 
 
 98
 We agree with the Court of Federal Claims that the government breached its obligations set forth in the Forbearance Letter. However, we decline to affirm the court's ruling granting summary judgment in favor of the government. We think there are genuine issues of material fact surrounding the cause of the seizure of the thrift. Drawing all reasonable inferences in favor of Barron as the nonmoving party, it cannot be ruled as a matter of law that governmental breach did not result in Monycor's seizure. Importantly, it is to be remembered that the Court of Federal Claims decided the forbearance issue after holding that "the assistance payments and the five-year supervisory forbearance constituted the limit of the government's contractual undertaking." Id. at 318. We have held above, however, that the government's obligations under the Monycor contract also included affording agreed-upon accounting treatment to supervisory goodwill and capital credits. This holding, we think, has the effect of significantly changing the landscape of the case from what it was when the Court of Federal Claims decided the forbearance issue.
 
 
 99
 The Court of Federal Claims recognized that "FIRREA had the effect, in part, of preventing Monycor from counting either its capital credit or its unamortized goodwill toward regulatory capital." Id. at 313. Significantly, the banking authorities seized Monycor and placed it in receivership precisely because it failed post-FIRREA regulatory capital requirements. On December 7, 1989, the OTS informed Monycor that it failed the new FIRREA capital requirements and that it would need to submit a capital plan. In February of 1990, Monycor was directed to comply with its Net Worth Maintenance Stipulation, and the Investors were told to comply with their Personal Net Worth Maintenance Stipulations. Monycor submitted its plan on March 1, 1990, and supplemented it in April and May. In June of 1990, the Investors also infused Monycor with $600,000 in capital. Having found Monycor's capital plan inadequate, the OTS denied it on June 28, 1990. The OTS then informed Monycor that it would be seeking an Individual Minimum Capital Requirement for the thrift. Throughout 1990 and 1991, Monycor attempted to solve its regulatory capital shortfall through various means, eventually submitting its final capital plan in May of 1991. Despite acknowledgement from the OTS Regional Director that he thought the plan may have been feasible, Monycor was seized on July 12, 1991 and placed in receivership.
 
 
 100
 The Court of Federal Claims granted summary judgment in favor of the government on the forbearance issue based upon the determination — in light of the record before it — that it was not the breach of the Forbearance Letter that caused the banking authorities to seize Monycor, but rather the thrift's failure to meet its capital requirements. Referring to its determination, the court stated, "[I]t was this capital inadequacy ... that we identified as the cause of the bank's seizure." Order Denying Reconsideration, slip op. at 2. Yet, as just seen, "this capital inadequacy" came in the wake of FIRREA and its regulations, which had the effect of removing the government's obligation under the contract to accord favorable treatment to supervisory goodwill and capital credits in determining whether Monycor met regulatory capital requirements. We think that, under these circumstances, there exist genuine issues of material fact with respect to the question of the extent to which Monycor's seizure can be traced to the government's breach of contract, so as to bar summary judgment in favor of the government. Accordingly, we reverse the grant of summary judgment in favor of the government on the forbearance issue and remand the case to the Court of Federal Claims for a determination of liability and, if appropriate, damages.
 
 CONCLUSION
 
 101
 The supervisory goodwill and capital credit provisions of the Monycor contract were contractual obligations of the United States. We therefore reverse the decision of the Court of Federal Claims to the contrary. FIRREA and its implementing regulations breached those obligations. At the same time, the United States was obligated under the Forbearance Letter to forbear for five years from holding Monycor accountable to regulatory minimum net worth requirements. We affirm the decision of the Court of Federal Claims that the government breached that obligation. The case is remanded to the Court of Federal Claims for further proceedings. On remand the court will address whether Plaintiffs are entitled to damages by reason of the government's breach of contract relating to supervisory goodwill and capital credits. The court also will address whether the seizure of Monycor and its placement in receivership resulted from breach of contract on the part of the government and, if so, the damages, if any, to which Plaintiffs are entitled. Accordingly, the decision of the Court of Federal Claims is
 
 
 102
 
 AFFIRMED-IN-PART, REVERSED-IN-PART, AND REMANDED.
 
 
 
 
 Notes:
 
 
 [1]
 We refer to Barron and the FDIC collectively as "Plaintiffs."
 
 
 [2]
 FIRREA called upon the OTS to "prescribe and maintain uniformly applicable capital standards" in accordance with strict statutory requirements. 12 U.S.C. § 1464(t)(1)(A);see also Winstar IV, 518 U.S. at 856-57 & n. 11, 116 S.Ct. 2432. Pursuant to FIRREA, thrifts were required to maintain core capital, which excluded unidentifiable intangible assets such as goodwill, at not less than three percent of total assets. 12 U.S.C. § 1464(t)(2)(A), (9)(A); see also Winstar IV, 518 U.S. at 857, 116 S.Ct. 2432. Though a transition rule was provided that permitted thrifts to count "qualifying supervisory goodwill" toward half the core capital requirement, this allowance was phased out by 1995. 12 U.S.C. § 1464(t)(3)(A); see also Winstar IV, 518 U.S. at 857, 116 S.Ct. 2432.
 
 
 [3]
 There is no issue in this case as to whether the FDIC's claims satisfy the case or controversy requirement of Article III of the ConstitutionSee, e.g., Anderson v. United States, 344 F.3d 1343, 1349-51 (Fed.Cir.2003); Admiral Fin. Corp. v. United States, 329 F.3d 1372, 1380-82 (Fed.Cir.2003); Landmark, 256 F.3d at 1379-82. It is true that a claim by the FDIC that does not exceed the amount owed to the insurance fund does not present an actual case or controversy, because the FDIC and the United States are not truly adverse as to the FDIC's claims. Admiral, 329 F.3d at 1381-82. In this case, however, the FDIC seeks $24 million in expectation damages, far more than the approximately $9 million paid out by the government to cover the thrift's insured deposits. Barron Bancshares, 53 Fed.Cl. at 314. Accordingly, because any recovery by the FDIC would involve additional amounts to be paid out to the thrift's creditors and potentially to its shareholders, the FDIC's claims as receiver for the failed thrift do present a justiciable case or controversy against the United States.
 
 
 [4]
 On January 10, 2003, pursuant to its Rule 58, the Court of Federal Claims dismissed the remaining counts in both complaints: counts nine and ten of Barron's first amended complaint alleging a taking and due process violations of the Fifth Amendment, respectively, and corresponding counts one and two of the FDIC's complaint. Those claims are not before us in this appeal
 
 
 [5]
 Because we hold that the FDIC's complaint relates back to Barron's original complaint, we need not reach the issues of whether the statute of limitations is subject to equitable tolling and whether certain agreements between the RTC and the United States Department of Justice served to toll the statute of limitations
 
 
 [6]
 The RTC operated in two capacities: as receiver and as RTC-CorporateAdmiral, 329 F.3d at 1374. After the RTC as receiver concluded the business affairs of a failed thrift, it conveyed to RTC-Corporate, by contract of sale, assets of the thrift. Id. (citing Winstar IV, 518 U.S. at 856, 116 S.Ct. 2432; Landmark, 256 F.3d at 1371 n. 1). Through this process, RTC-Corporate became the owner of all of Monycor's legal claims that were formerly held by the RTC as receiver. See id.
 
 
 [7]
 FRF was the thrift deposit insurance fund managed by the FDIC. It was created when FIRREA abolished the FSLICSee Admiral, 329 F.3d at 1374.
 
 
 [8]
 When the RTC's assets were transferred to the FRF, two accounts were created: FRF-FSLIC, 12 U.S.C. § 1821a, and FRF-RTC, 12 U.S.C. § 1441a(m). FRF-FSLIC contained the assets of FSLIC, while FRF-RTC contained the assets of the RTC. Both accounts were managed by the FDICSee Admiral, 329 F.3d at 1374-75.
 
 
 [9]
 The assets of the RTC, as successor to the FSLIC, included the right to repayment of payments made to insured depositors when the RTC paid insured depositors of a failed thriftAdmiral, 329 F.3d at 1374-75. The liabilities of the RTC, as successor to the FSLIC, included the obligation to pay breach of contract claims against the FSLIC. Id.
 
 
 [10]
 The personal net worth maintenance stipulations for Barron Bancshares and the Investors were called for by Bank Board Resolution No. 86-1215 and executed contemporaneously with the Bank Board Resolutions and the Assistance Agreement. They required Barron Bancshares and the Investors, for the first five years of the contract, to maintain the net worth of the thrift at the greater of three percent of its total liabilities or the amount required by regulation
 
 
 [11]
 The integration clause read, in relevant part, "This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it...." Assistance Agreement § 24
 
 
 [12]
 See also Winstar IV, 518 U.S. at 866, 867, 116 S.Ct. 2432 (finding that absent the ability to include goodwill in the relevant calculations, the new Winstar thrift would have had a tangible net worth of negative $6.7 million, and without its promised forbearances, the new Statesman Bank thrift would have remained insolvent by almost $9 million).
 
 
 [13]
 It is true that in discussing the Glendale contract, this court added that its conclusion as to the nature of the contract was "supported by other evidence and by the circumstances surrounding the transaction."Winstar III, 64 F.3d at 1542. The court then went on in the same paragraph to refer to "the extensive negotiations and the conditions regarding [the] use" of supervisory goodwill as demonstrating the parties' intent to use supervisory goodwill for regulatory capital purposes. Id. We note, however, that this paragraph immediately followed the paragraph in which the court stated,
 We conclude based on all of the contemporaneous documents, which under the integration clause of the
 [Supervisory Action Agreement] collectively constituted the "Agreement" of the parties, that the Bank Board and the FSLIC were contractually bound to recognize the supervisory goodwill and the amortization periods reflected in the approved accountants' letter. It is clear from the documents that this was the intent of the parties.
 Id. at 1541-42. Under these circumstances, we are not inclined to attach significance to the court's passing reference to "other evidence" beyond the contract documents.
 
 
 [14]
 In its brief, the government refers us to authority to the effect that the parol evidence rule does not bar consideration of the parties' dealings during contract performance but prior to litigation, citing, e.g.,Blinderman Construction Co. v. United States, 695 F.2d 552, 558 (Fed.Cir.1982). We do not disagree. In this case, however, the court relied upon, at least in part, parol evidence in the form of precontract negotiations and dealings. See Barron Bancshares, 53 Fed.Cl. at 317-18 (referring to Barron's failure to request either supervisory goodwill or capital credit treatment in its bid to acquire Barron County and the absence of a discussion of either treatment in precontract negotiations). As discussed above, such evidence is barred from consideration by the parol evidence rule. Moreover, we do not find it necessary to resort to extrinsic evidence in this case because we hold above that the supervisory goodwill and capital credit provisions in the Monycor contract were clear and unambiguous.
 
 
 [15]
 The Stipulation was required by Bank Board Resolution No. 86-1215. It was executed on the same date as the Bank Board Resolutions and the Assistance Agreement
 
 
 [16]
 Section 13(f) required Monycor to "comply in all material respects with all applicable statutes, regulations...." Assistance Agreement § 13(f)